**UNITED STATES of America,**
Appellee,

v.

**Gladys Perez MALO, Appellant.**
**No. 46, Docket 33484.**

United States Court of Appeals
Second Circuit.

Argued Sept. 9, 1969.

Decided Oct. 14, 1969.

Cutters are also capable of deep welding." DX Nos. 99–102, answer to Question 3 on DX Nos. 100 and 102.

Michael W. Leisure, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York and Douglas S. Liebhafsky, Asst. U. S. Atty., on the brief), for appellee.

James D. Wiese, New York City, for appellant.

Before LUMBARD, Chief Judge, SMITH and FEINBERG, Circuit Judges.

LUMBARD, Chief Judge:

Gladys Malo's appeal from her conviction by a jury for unlawful concealment of heroin, 21 U.S.C. §§ 173, 174 (1964), raises two questions: whether there was probable cause for her arrest on February 15, 1967, at which time a glassine envelope containing heroin was found tucked in the waistband of her slacks, and whether evidence regarding the search of her apartment later the same evening and seizure there of several more glassine envelopes of heroin tainted her conviction, even though the jury acquitted her of unlawfully concealing the heroin found in her apartment. We find no error and affirm the conviction.

Prior to trial Judge Pollack took the testimony of agent Cook on a motion to suppress, at which the defense offered no evidence. Cook swore that his attention was first directed to Gladys Malo by an informant who advised him sometime in 1967 that Malo and Gloria Marti, who lived together at 643 West 171st Street in Manhattan, were storing narcotics and delivering it to customers of Daniel Pimienta. Cook knew that the informant had provided the Bureau of Narcotics with reliable information which had resulted in ten federal narcotics convictions. Thereafter Cook observed Malo in the company of Pimienta in the fall of 1967. On the morning of February 15, 1968 the informer told Cook by telephone that Malo and Marti would meet a man that evening at 8 o'clock at 175th Street and Broadway, that the man would give them money and later that night they would deliver narcotics to him. Surveillance of the two women confirmed the information: they

left their apartment just before 8 o'clock, got into a Ford Mustang and drove to 175th Street and Broadway. When an unidentified negro man arrived in a Chevrolet and parked on a different corner, the two women left their car and went into his car. After making a U-turn and eluding the agents, the car went south on Broadway and returned after 10 minutes. The women then got out, entered their car, and returned to their apartment, after going south of 171st Street and doubling back.

Cook telephoned his informant and was advised that the women would deliver the narcotics to the man at 10:30 P.M. at 175th Street and St. Nicholas Avenue. Surveillance of the apartment disclosed the women leaving five minutes before 10:30 with two dogs and driving off in the Mustang which they parked on Wadsworth Avenue, one block west of St. Nicholas Avenue, between 175th Street and 176th Street. When the women looked around in all directions, as if apprehensive of being seen, Cook and the agents with him proceeded to arrest Malo and Marti. Cook told Malo she was under arrest and ordered her out of the Mustang. When she put up her hands at Cook's command, her black leather coat opened and Cook could see a glassine package tucked in the waistband of her slacks. The package contained a white powder which proved to be heroin.

After Malo had been ordered into the government car, Cook advised her of her constitutional rights. She said Pimienta had given her the package and told her to deliver it. She expressed concern about the two dogs, and Cook suggested she leave them in the apartment. When Cook asked her if she would permit a search of her apartment, she agreed and said there was nothing else there. At Cook's suggestion, she agreed to sign a form consenting to a search. Cook testified that she said she could read English, and after looking at the form she signed it. In a search of the apartment the agents found several glassine packages of heroin hidden between towels in a bureau drawer. At the suppression hearing no evidence was offered by the defendants. Judge Pollack found probable cause for the arrest and consent for the search of the apartment and denied the motion to suppress.

At the trial, in addition to Cook's testimony, the government called other agents who confirmed the surveillance and the arrest and the searches which resulted in the seizure of heroin on Malo's person and in the apartment. At the conclusion of the government's case, Judge Weinfeld dismissed the indictment as to Marti.

Malo testified in her own defense. She had known Pimienta, her "boyfriend," for more than a year. He had signed the lease to her apartment and had a key, he visited frequently and had given her the Mustang. On February 13 Pimienta gave her a large envelope containing two packages with instructions to deliver one to a man who would approach her on 175th Street and Broadway at 8 P.M. on February 15. She agreed to deliver the envelope and she swore that she thought it might contain a valentine for the unknown man's wife. The man met her at the appointed place and she gave him the package. He then instructed her to deliver the other package to him at 176th Street and Wadsworth Avenue that night at 10:30. She claimed she had no knowledge of what was in the package and knew nothing about the glassine envelopes of heroin found in her bureau drawer.

Daniel Pimienta also testified. He said he had met Malo two years earlier, he signed the lease to the apartment and had visited her on three occasions. He admitted that some articles of clothing found in the apartment were his. He claimed he had not seen Malo at the apartment since November or December of 1967. He denied having given her the package or the Mustang automobile.

### The Arrest

 There was probable cause for the agents to arrest Malo as there was

good reason to believe that she and Marti had gone to a second rendezvous, in accordance with the information received by Cook, in order to deliver heroin and that they were then in the act of committing the crime of concealing heroin. The information which initiated Cook's surveillance of the two women came from an informant who had already given the Bureau of Narcotics information which had resulted in ten federal narcotics convictions. Thereafter Cook's investigation of the two women confirmed that they knew Pimienta as he saw them together. When a few months later on February 15, 1968, the informant gave specific information about a meeting with an unknown man, Cook's own observation confirmed the correctness of what the informant had told him. After the 8 o'clock rendezvous which took place under suspicious circumstances, the informant told Cook, when Cook telephoned him, that the women would deliver the heroin to the man at 10:30 P.M. at 175th Street and St. Nicholas Avenue. When the women left their apartment house just five minutes prior to the time set for the second appointment and drove toward 175th Street and St. Nicholas Avenue (parking just one block away on Wadsworth Avenue, between 175th and 176th Streets), left their car and looked around in all directions, Cook and the agents with him had good reason to believe that one or both of them were in possession of heroin which they were about to deliver to the man they had met just a short while before at 8 P.M.

Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), are not in point as there was no showing in those cases of the basis for believing in the reliability of the informant apart from the confirmation of his meager information by the observation of the law officers themselves. Here there was every reason to credit what was said by an informant who had given much accurate and reliable information in the past. Further, the second criterion enunciated in *Aguilar* and *Spinelli*—the agents at the time of the arrest know sufficient of the "underlying circumstances" from which the informer concluded that Malo was concealing heroin—is also met here. In Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), the Supreme Court held that if the details supplied by the informer are sufficiently specific and are subsequently corroborated by the agent's observation, the agents can infer that the informer's source of information is reliable. In *Draper*, the informer had said that defendant would arrive on a certain train on one of two mornings and that he would be dressed in a specified way. Here, the informer told Cook when Malo would leave and, within a block where she would go on two trips in one evening. The agents had probable cause to arrest.

There was no error in not requiring the government to disclose the name of the informant at the hearing on the motion to suppress. Whether or not to compel such disclosure was in the discretion of the judge. See McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). Likewise we think it was proper for the government to refuse to furnish the names of the cases in which the informer had furnished information to the government. Of course other means of testing the claim of the informer's reliability, such as questions about the number of tips from the informer that were unproductive, the length of his service to the government, or the rate of his pay, were open to the defense.

As there was probable cause for Malo's arrest, the search of her person was lawful and the heroin found on her person was admissible in evidence against her.

### Search of the Apartment

 We see no reason to disturb Judge Pollack's finding that Malo consented to the search of her apartment. He believed the agent's testimony that

Malo could read English and that she freely signed the form presented to her by Cook. From Cook's testimony it was apparent that she wished to return to the apartment to leave her dogs there and also because she believed that no narcotics would be found in the apartment.

We cannot agree with the defendant that the government is required to obtain a search warrant in order to search premises where the person having the right to control use of the premises freely consents to the search. Of course, whether a signed consent has been freely given is a question of fact, and it may be that the trier of the fact will not credit the consent as being voluntary when there has been an arrest. But on the conceded facts here we cannot say that there was insufficient evidence for Judge Pollack's ruling. While the government may be better advised to seek a warrant in some cases, we are not unmindful of the fact that at 10:30 P.M. it may take many hours to make out the necessary affidavits and papers and find a commissioner or a judge and then return to the premises. Meanwhile other agents must be found to guard the premises lest the contraband thought to be there be removed by a confederate. These are practical and difficult questions which must be decided by the law enforcement agents on the spot and without briefing. It would ill serve the proper operation of law enforcement officers in getting evidence, apprehending offenders and seizing contraband narcotics if the courts were to require resort to search warrant procedure in every case regardless of circumstances.

 In any event, Malo could not have been prejudiced at trial by the admission in evidence of the heroin found in her apartment as she was acquitted on the second count of the indictment which charged her with such possession. There was no error in trying her on both counts.

On this appeal, defendant argues for the first time that the presumption in 21 U.S.C. § 174 (1964) providing that possession of a narcotic drug shall be deemed sufficient evidence of illegal importation and knowledge of importation is unconstitutional in the light of Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). This contention has no merit. See United States v. Cuadrado, 413 F.2d 633 (2d Cir. July 15, 1969).

Conviction affirmed.