**UNITED STATES of America,**
**Appellee,**

v.

**Ralph FEBRE, Appellant.**

**No. 329, Docket 33241.**

United States Court of Appeals
Second Circuit.

Argued Nov. 10, 1969.

Decided Jan. 8, 1970.

Joseph J. Marcheso, New York City (David Wallenstein and Bauman & Marcheso, New York City, on the brief), for appellant.

Daniel J. Sullivan, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., and David A. Luttinger, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before MOORE, KAUFMAN and HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

In order to convict a defendant for the concealment or transportation of illegally imported narcotics under 21 U.S.C. § 174, the government must prove that he knew the narcotics to be illegally imported. Since this subjective element of knowledge is often difficult to establish by direct evidence, the government generally relies upon the presumption contained in § 174, which provides that unexplained possession of narcotics shall be deemed sufficient evidence of knowledge of illegal importation. In this case we are called upon to resolve several questions concerning the employment of this presumption: whether the prosecution offered evidence of possession sufficient to invoke the presumption, whether the court properly instructed the jury on its consideration of the presumption, and, finally, whether the Constitution prohibits the application of the presumption in cases involving the transportation of heroin.

## I. *Facts*

At approximately 9 o'clock on the evening of February 20, 1967, an unnamed informant employed by the Federal Bureau of Narcotics placed a telephone call to Joseph Pego.[1] Clarence Cook, a Spe-

---

1. Joseph Pego was charged as a co-defendant in the indictment. Shortly after trial he elected to plead guilty to all five counts of the indictment; he did not testify at trial.

cial Agent of the Bureau, who had once previously purchased narcotics from Pego, monitored that call. The informant told Pego that Cook wished to purchase an ounce of heroin. Pego replied that he did not have this amount of heroin and would have to get it. He directed Cook and the informant to proceed to the informant's residence where he would telephone them when he had obtained the heroin.

Twenty minutes after he received the call, Pego left his residence in the Bronx and proceeded by taxi to the Bat Cave Bar in Manhattan. Pego arrived at the Bat Cave at 9:35, ordered a drink, and then walked to the back of the bar where he talked with a group of customers who were playing pool. At 10:15 appellant Ralph Febre entered the bar and talked briefly with Pego. After five minutes, Febre and Pego left the Bat Cave together and continued their conversation in Febre's car, which was parked in front of the bar. Just before 10:30, Pego returned to the bar alone, then immediately telephoned the informant to tell him that "he had the stuff" and would deliver it to Cook at the corner of 170th Street and Jerome Avenue in half an hour. Pego then returned to the car and drove off with Febre, who dropped him at the corner where the sale was to occur. When Cook arrived, Pego gave him an ounce of heroin and received in return $50 Cook owed for a previous purchase and $1200 of the $1400 price of the ounce.

Agent Cook arranged to pay the remaining $200 to Pego on February 23, 1967 at the corner of 57th Street and 9th Avenue. Pego was driven to the meeting place by Febre, to whom he handed a "wad of money" after he had received payment from Cook. This series of events formed the basis of count two of the indictment, the first substantive offense with which Febre was charged.[2]

Cook and Pego met once again at the corner of 170th Street and Jerome Avenue on the evening of March 8. At this time Cook complained about the quality of the heroin he had purchased, and after discussion, it was agreed that Pego would provide Cook with a sample before Cook made further purchases and that this sample would be delivered later that evening. Pego proceeded to 1551 Walton Avenue where he entered Apartment 5B, the residence of Ralph Febre's brother Joseph. Five minutes later he was observed leaving the building in the company of Ralph Febre. He then left Febre and delivered the sample to Cook himself.

Cook apparently considered the sample satisfactory for five days later he negotiated with Pego for the purchase of a quarter kilogram of heroin. Pego set the price at $8700 and promised to deliver the "quarter" within forty-five minutes. After a visit to Apartment 5B at 1551 Walton Avenue Pego returned to the place where Cook was waiting to inform him that there would be a delay. Pego then returned to 1551 Walton Avenue. Two hours later Ralph Febre also entered the building. After fifteen minutes, Pego emerged, returned to Cook, and told Cook that "his people were unable to get the half a kilogram [from which Cook's "quarter" was to come] and to see him in a couple of weeks." Count three of the indictment arose out of these facts.

Cook did see Pego again three weeks later. On this occasion, April 4, 1967, it was agreed that on the following evening Pego would provide Cook with the quarter kilogram of heroin he had previously been unable to obtain. The next evening, after directing Cook to await delivery at the Port Authority Bus Terminal at 178th Street and Broadway, Pego joined Febre and one Edward Bless, named as a defendant in Count Four, at the Bat Cave Bar. After ascertaining that Pego had seen Cook, Febre

2. Count one of the indictment arose out of an earlier sale of narcotics to Cook by Pego. Pego was the only defendant named in this count.

asked, "What does he want?" When Pego replied "a quarter" Febre turned to Bless and asked "if he could handle it." Bless said that he could and that it would take about forty-five minutes. A few minutes later he left the bar. After Bless' departure, Febre and Pego continued their conversation which centered on experiences in the Armed Forces. At one point in the conversation, however, Febre remarked, "Things were going to be much better now that Willy was dead because Eddie was a much better guy to get along with."

One hour after he had left the bar, Bless returned and told his colleagues, "It can't be done tonight. It has to be tomorrow." Although Febre seemed to object to this statement, Bless apparently prevailed, and the sale did not occur until the next afternoon, April 6. These events gave rise to the fourth count of the indictment.

Pego was arrested as he transferred the quarter kilogram of heroin to Cook on April 6. Subsequently both Bless and Febre were also arrested. On November 1, 1968, following a five-day trial before Judge Metzner and a jury Febre was convicted of the substantive crimes set forth in counts two through four of the indictment and also for conspiring with Pego and Bless to violate § 174, the charge contained in Count Five of the indictment.[3] Judge Metzner sentenced him to four concurrent six-year sentences.

## II. *Possession*

Febre concedes that the evidence presented by the government sufficed to prove that he had facilitated the transportation of heroin. However, he contends that the prosecution failed to show that he knew this heroin to have been illegally imported, an essential element of the crimes for which he was charged and convicted. Admittedly, there was no direct evidence of knowledge of illegal importation. But Febre also claims that the government's proof failed to show that he ever "possessed" the heroin, and accordingly that the statutory presumption of knowledge of illegal importation was inapplicable.

 Although the law is established that the "possession" required to invoke the presumption need not be actual physical custody of narcotics, we believe it appropriate to begin our analysis with a consideration whether the jury could properly have found that Febre physically possessed the heroin involved in the charges against him. Viewing the evidence in a light most favorable to the government, as we are required to do on this appeal from the conviction, we conclude that the evidence on count two supports an inference that Febre actually possessed the heroin Pego sold to Cook on February 20, 1967.[4] We recall that on February 20 Cook made known his desire to purchase an ounce of heroin. At the time Cook made this request, Pego stated that he did not have the heroin and would telephone Cook as soon as he obtained it. Pego then spent approximately thirty minutes at the Bat Cave Bar talking with several patrons. At no time during this period did he attempt to contact Cook. However, the evidence reveals that as soon as he had finished speaking with Febre, who had arrived at the bar in his own car and in which he was the sole occupant, Pego immediately informed Cook that he now had the "stuff." Febre and Pego then proceeded to the place where the sale occurred in Febre's car. Pego's entire course of conduct on this occasion leads one to the reasonable conclusion that he had arranged to have the narcotics re-

3. As we have stated, *see* note 1, Pego entered a plea of guilty to all five counts of the indictment. He received five concurrent five-year sentences. Bless was convicted on count four and sentenced to imprisonment for seven years.

4. The permissible finding of possession of the narcotics involved in count two of the indictment also suffices to establish the possession necessary to Febre's conviction for conspiracy to violate § 174. Accordingly, his conspiracy conviction on count five is affirmed.

quested by Cook delivered to the Bat Cave Bar. The jury could also fairly and reasonably have concluded that Febre had personally delivered the ounce of heroin to Pego and accordingly, had actually possessed it.

■ On counts three and four, however, the evidence of actual possession was far weaker, indeed almost nonexistent. The only heroin involved in the transaction which gave rise to count three was the small sample, a quantity of little more than one gram, which Pego delivered to Cook on the evening of March 8. Febre's only and tenuous connection with this sample was that he was seen emerging from an apartment building with Pego when Pego was on his way to deliver the sample to Cook. Since his entry into the apartment building apparently preceded that of Pego (Febre was not seen entering), Febre could not be charged with personally having transported the sample to the apartment at Pego's request. Even if the jury had concluded that Febre and Pego had been in the same apartment, it had no way of knowing whether Febre actually handed the sample over to Pego, whether someone else who may have been in the apartment did so, whether Pego obtained the sample himself from a stock of heroin he knew to be in the apartment or somewhere else in the building, or whether Pego had the sample in his possession when he had spoken with Cook earlier and had returned to the apartment only to inform others who may have been involved in the conspiracy of his arrangements with Cook. The inferences required to support a finding of actual possession on this count rest on too tender a reed. There was also no evidence whatsoever to suggest that Febre had actually possessed the quarter kilogram of heroin which Pego transferred to Cook on April 6 and which formed the basis for count four. Moreover, viewing the evidence as a whole, we see no pattern of conduct which could justify a conclusion that Febre invariably acted as a messenger who transported heroin from Bless, the wholesale dealer, to Pego, the street peddler. To be sure, Febre apparently did perform such a function on February 20, but the conversation among all three codefendants on April 5 reveals that Bless also had direct dealings with Pego. We therefore conclude that, with respect to counts three and four, the government failed to prove that Febre had actually possessed the heroin involved in the transactions which gave rise to those counts.

■ We do not mean to suggest from the foregoing discussion that proof of actual physical custody of narcotics is necessary to invoke the presumption; a showing of constructive possession through the exercise of dominion and control over narcotics will also suffice. United States v. Jones, 308 F.2d 26, 30 (2d Cir.1962) (*en banc*). In *Jones* we reaffirmed an earlier decision that "one having a working relationship or a sufficient association with those having physical custody of the drugs so as to enable him to assure their production, without difficulty, to a customer as a matter of course may be held to have constructive possession," 308 F.2d at 30; see United States v. Hernandez, 290 F. 2d 86 (2d Cir.1961). We also set forth several indicia of constructive possession: "Properly admitted evidence showing that a given defendant set the price for a batch of narcotics, had the final say as to means of transfer, or was able to assure delivery, may well be sufficient to charge the defendant with a constructive possession of the narcotics * * *." 308 F.2d at 31. Since our decision in *Jones,* in all of the cases in which we have upheld a finding of constructive possession at least one of these indicia has been present. See, e.g., United States v. Lopez, 355 F.2d 250 (2d Cir.1966); United States v. Rivera, 346 F.2d 942 (2d Cir.1966); United States v. Carter, 320 F.2d 1 (2d Cir.1963); United States v. Douglas, 319 F.2d 526 (2d Cir.1963); United States v. Ramis, 315 F.2d 437 (2d Cir.1963).

In this case, none of the factors which have led us to find constructive posses-

sion in the past are present. Febre did not set the price or arrange the means of transfer for any of the heroin Pego sold to Cook; nor was he able to assure delivery. Indeed, the evidence indicated that Pego negotiated the price himself, allowed Cook to defer payment himself, and set the time and place of transfer himself. Although the conversation of April 5 shows Febre to have been deeply involved in an ongoing conspiracy to sell heroin, it also reveals that he was utterly unable to assure the prompt delivery of narcotics to prospective customers. When Bless expressed his inability to fill the order for a quarter kilogram of heroin that evening, Febre had no recourse but to express his irritation and to accept a delay until the following day.

For these reasons we conclude that Febre cannot be found actually or constructively to have possessed the narcotics which led to his convictions on counts three and four of the indictment.

### III. *Instructions*

■ Febre contends that the court's charge was erroneous for two reasons, both of which relate to the issue of possession. First, Febre argues that on count two of the indictment, the court's charge allowed the jury to impute to him the possession of narcotics by Pego.[5] Specifically, the judge instructed the jury that if it found Febre to have been engaged with Pego in a joint undertaking to violate the law, "then Febre is chargeable with the acts and statements of Pego which may be considered by you in determining the four elements of the crime in each count." We agree with Febre that if this instruction had the effect of imputing the possession of his co-conspirators to him, his conviction on count two must be reversed, for "[p]ossession, actual or constructive, must be shown with respect to each individual conspirator, facilitator, or aider and abettor." United States v.

Hernandez, 290 F.2d 86 (2d Cir.1961); see United States v. Santore, 290 F.2d 51 (2d Cir.1960) (Waterman and Friendly, JJ.). But we do not read the instruction as having had this effect. In our view, the instruction told the jury only that once it had found Febre and Pego to have been involved in a common criminal scheme, it could consider the acts and statements of Pego in determining whether Febre had himself possessed narcotics. We conclude this was not error.

■ Febre's other claim is that the court failed to instruct the jury that a finding of possession was just as necessary for a conviction on the conspiracy count as for a conviction on the substantive counts. We do not believe that the court's failure specifically to mention possession in its charge on the conspiracy count was erroneous. The judge clearly charged the jury that to convict Febre for conspiracy to violate § 174 it must find that he conspired to facilitate the transportation of narcotics which he knew to have been illegally imported. By reference to the charge on the substantive counts, the jury must have been aware that it could base this finding of knowledge of illegal importation only on direct evidence of knowledge or on proof of possession sufficient to invoke the statutory presumption of knowledge.

### IV. *Constitutionality of the Presumption*

■ The Supreme Court has declared the constitutionality of the § 174 presumption of knowledge of illegal importation arising out of possession in Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (1925). In Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), a case in which the Supreme Court held a similar presumption relating to marijuana unconstitutional, the Court intimated "no opinion whatever about the contin-

5. Febre also directed his argument to similar instructions which related to counts three and four. Since we are reversing his convictions on these counts on other grounds, we need only concern ourselves with the effect of the charge on count two.

ued validity of the presumption relating to 'hard' narcotics [the § 174 presumption]." 395 U.S. at 37 n. 92, 89 S.Ct. at 1553. The basis for the Court's action on marijuana was evidence that very significant amounts of marijuana were grown in the United States; we have been directed to no evidence which suggests that significant quantities of heroin are manufactured illegally in this country. Indeed we have held on several occasions that the presumption of knowledge of illegal importation arising out of the possession of heroin survives the Supreme Court's decision in *Leary*. See United States v. Malo, 417 F.2d 1242 (2d Cir.1969); United States v. Cuadrado, 413 F.2d 633 (2d Cir.1969); United States v. Bennett, 409 F.2d 888 (2d Cir.1969).

## V. *Disposition of This Appeal*

Because the evidence was insufficient to support a finding that Febre possessed the narcotics which led to his convictions on counts three and four of the indictment, we conclude that his convictions on these two counts must be reversed. Until recently we could confidently have ended our inquiry with the conclusion that Febre's conviction on count two was supported by sufficient evidence. Since Febre received four concurrent sentences, if we were to apply the concurrent sentence doctrine we would not be required to reach his objections to his convictions on counts three and four. See Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L. Ed. 1774 (1943). Last Term, however, in Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the Supreme Court declined to apply the concurrent sentence doctrine and suggested that there was no "satisfactory explanation" for its existence. 395 U.S. at 789, 89 S.Ct. 2056. In declining to apply the doctrine, the Court was concerned that convictions which the principle precluded from being reviewed could later have undesirable collateral consequences for defendants. As we read *Benton* the doctrine may still be em-

ployed if it is reasonable to conclude in the particular case that no undesirable collateral consequences would flow from its application. In fact, we have applied the concurrent sentence doctrine in a case decided after *Benton*. See United States ex rel. Weems v. Follette, 414 F. 2d 417 (2d Cir.1969). But *Weems* was a collateral attack on a conviction rather than a direct appeal, and the Court remarked in *Benton* that a "stronger case for total abolition of the concurrent sentence doctrine may well be made in cases on direct appeal." 395 U.S. at 793, n. 11, 89 S.Ct. at 2062.

■ Although in this case we have determined not to apply the concurrent sentence doctrine and, instead, to reverse Febre's convictions on counts three and four, we see no reason to vacate the convictions and remand for a new trial on the other two counts. Mindful of the *Benton* rationale, we consider it highly unlikely that the evidence presented on the two counts we have reversed could have been mistakenly considered by the jury as tending to establish guilt under the second count of the indictment. Count two arose from a discrete series of events, transfer of the narcotics on February 20 and payment on February 23; none of the evidence presented on the other substantive crimes charged in the indictment related to events which occurred prior to March 8. Furthermore, the testimony on the reversed counts would have been before the jury even had these counts been dismissed, for all of this evidence tended to show the existence of the conspiracy charged in count five. For this reason, we consider inapposite the analogy drawn by our brother Hays between this evidence and inadmissible evidence of other crimes.

Neither do we discern any cause to remand for resentencing, as we have done on occasions where the convictions on the reversed counts may have affected the sentences imposed on the remaining counts. See United States v. Hines, 256 F.2d 561 (2d Cir.1958). Since Febre's six-year sentence was only one year

longer than the statutory minimum, we believe it unlikely that resentencing would result in a reduced sentence. Strong evidence that the number of counts on which each defendant was convicted had no influence on the court's decision on sentencing buttresses this conclusion. Pego, convicted on all five counts of the indictment, was sentenced to only five years' imprisonment; Bless, convicted only on the fourth count, received a seven-year sentence.

The convictions on counts two and five of the indictment are affirmed and those on counts three and four reversed.

HAYS, Circuit Judge (dissenting):

I agree with Judge Kaufman that the conviction on counts three and four must be reversed. I disagree on the consequences of that reversal. In my opinion the case should be remanded for a new trial on counts two and five.

While Benton v. Maryland does not expressly rule out for all purposes the concurrent sentence doctrine, it manifests such basic dissatisfaction with the doctrine as to suggest that its total elimination merely awaits a proper case. And, as Judge Kaufman notes, the Court in Benton says that "A stronger case for total abolition of the concurrent sentence doctrine may well be made in cases on direct appeal, as compared to convictions attacked collaterally by suits for post-conviction relief." 395 U.S. at 793, footnote 11, 89 S.Ct. at 2062.

The effect to be given Benton must, it seems to me, require a change in our rule from one providing that in the case of concurrent sentences, the questioned conviction on one count will not be considered unless it can be shown that the defendant would be prejudiced if the conviction was unjustified, see United States v. Barash, 365 F.2d 395 (2d Cir. 1966), to one providing rather that prejudice will be presumed unless it is clearly shown that in fact no prejudice would result. See United States ex rel. Weems v. Follette, 414 F.2d 417 (2d Cir.1969).

In the present case not only do I disagree with Judge Kaufman's view that a lighter sentence could not possibly result from a remand for resentencing, but I would go much farther than is suggested by Judge Kaufman's opinion and would remand for a new trial on the ground that the jury may well have been influenced with respect to counts two and five by "spill over" of the evidence as to counts three and four, and by the fact that the court's sending the evidence on counts three and four to the jury gave to the jury the right to find appellant guilty on the most tenuous evidence.

We are quick to reverse a conviction on the ground of prejudice where evidence of defendant's commission of other crimes has been introduced. How can we consistently hold that the introduction of wholly insufficient evidence of other crimes in the present case did not unfairly prejudice defendant's case?