**UNITED STATES of America, Appellee,**

v.

**Serge Christian HYSOHION et al., Appellants.**

Nos. 296–298, Dockets 34819, 34828 and 34829.

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1970.

Decided Aug. 23, 1971.

Moore, Circuit Judge, filed a concurring opinion.

Arthur J. Viviani, Charles B. Updike, Jack Kaplan, Asst. U. S. Attys., Whitney North Seymour, Jr., U. S. Atty., for appellee.

Phylis Skloot Bamberger, Milton Adler, New York City, for Hysohion.

Abraham Solomon, New York City, for Roupinian.

Theodore Krieger, New York City, for Rimbaud.

Before WATERMAN and MOORE, Circuit Judges, and LEVET, District Judge.*

WATERMAN, Circuit Judge:

The appellants seek reversals of judgments of conviction entered below in the Southern District of New York after a joint trial before Judge Lasker sitting without jury. The three appellants were jointly indicted in a two count indictment on September 23, 1969. In the

* Of the Southern District of New York, sitting by designation.

first count George Roupinian and Eduardo Rimbaud were charged with having violated 21 U.S.C. §§ 173, 174, in that they illegally dealt with approximately two kilograms of heroin hydrochloride in the Southern District knowing that the drugs they dealt with had been illegally imported into the United States. In the second count they and the third appellant, Serge Christian Hysohion, were charged with having violated the same sections by conspiring to deal illegally with imported narcotic drugs, knowing the drugs to have been imported.

The trial judge found Roupinian guilty on the first, the substantive count, but acquitted Rimbaud thereon. All appellants were convicted on the conspiracy count. We affirm the conviction of Roupinian on the substantive count and reverse the several convictions of all three appellants on the second, the conspiracy, count.

Not one of the appellants testified at trial, and the facts adduced by the Government in support of the charges made in the indictment are detailed hereafter.

Rimbaud and Hysohion were arrested on March 9, 1969, charged with having violated 21 U.S.C. §§ 173, 174, in an entirely separate transaction, completely unrelated to the proceedings here, which involved alleged dealings in 22 kilograms of imported heroin.[1]

They were promptly incarcerated in a maximum security cell at the Federal House of Detention, West Street, New York City, to await an indictment.[2] While so incarcerated they became acquainted with a fellow prisoner awaiting trial, one Willie Everett, who subsequently became the Government's major witness in the present case. Everett testified that from March 10 to March 25 he had had two conversations with Rimbaud and Hysohion and a third with Rimbaud alone. He placed the first contact by reference to the approximate dates when Rimbaud and Hysohion were placed in maximum security, and the final one as having taken place a few days before he was released from West Street on bail on March 28, 1969.

At the first conversation Everett told his cellmates that he was a big drug dealer. Everett neither spoke nor understood French, but Hysohion spoke and understood English. Rimbaud's comprehension of English was so limited that he was forced to communicate with Everett by writing English words on paper. Most of the visiting at this time and at the second conversation on the next day was between Hysohion and Everett with an occasional translation by Hysohion for the benefit of Rimbaud. With an apparent wish to see that their new friend, the big drug dealer, was supplied with an inventory, Hysohion, in Rimbaud's presence, told Everett that they could supply him with "drugs and junk" at $30,000 per kilo, delivery to be made in June.

Thereafter an elaborate and somewhat bizarre plan was devised. It was agreed that Everett, upon his release, would wait at his home for a midnight telephone call from an unidentified person. The day following that call he was to go to a coffeehouse in mid-Manhattan to complete the transaction. The person who telephoned would have control of the drugs and would be reading a copy of the French newspaper "Le Figaro" with the numeral "5" written in red in a corner. Everett was instructed to carry his money in a black briefcase. During this strategy talk Hysohion periodically spoke in French with Rimbaud. Hysohion sought Everett's assistance in smuggling out of the prison a letter which the prosecution suggested below was to be delivered to George Roupinian, the third defendant in this action. Everett stated that in a later conversation

---

1. When indicted and tried they were convicted, were sentenced to long terms of imprisonment, and their convictions were affirmed upon appeal to this court. See United States v. Hysohion and Rimbaud, 439 F.2d 274 (2 Cir. 1971).

2. Indictment was filed May 8, 1969.

Hysohion said that he had been able to get the letter out through his attorney.[3]

A second conversation between Everett and Hysohion, again in English and again in Rimbaud's presence, took place on the next day. At this time it was claimed that Hysohion told Everett that delivery would be made at a coffeehouse on 47th Street in Manhattan.

A third conversation, this one between Rimbaud and Everett, occurred while Hysohion was in court. Rimbaud communicated by writing in English. He offered to provide, employing the same delivery system, two kilograms of narcotics in May for $55,000. Everett stated that he would pay only $50,000, and Rimbaud acquiesced.

On March 26, Everett informed the Federal Bureau of Narcotics and Dangerous Drugs of his conversations and the tentative deals he had made. Two days later he was released on bail.

The plan progressed. Though Hysohion and Rimbaud remained in West Street, Everett, on July 6, received the midnight call; he was told that the merchandise would be ready in ten or fifteen days. On July 16, in a second telephone call, he was informed that delivery would be delayed a week. Finally, on July 19, the caller suggested July 27 as a good day to make the sale. Everett objected to the date and, instead, July 26 was chosen. That date was confirmed by two subsequent calls.

At the appointed time Everett and Federal Agent Ford entered the coffeehouse. Defendant Roupinian was seated at the counter reading a copy of "Le Figaro" marked with a red "5" in the upper corner. Ford identified himself as Everett's partner and asked to see the drugs. Roupinian displayed the heroin, Ford tendered the payment for it, and thereupon nearby surveilling agents arrested Roupinian.

After being advised of his rights, Roupinian confessed to possession of more heroin in his apartment and consented to having it searched. In his bedroom the agents uncovered four cartons of ski poles bearing U. S. Customs importation stickers. Forty-six of the 200 ski poles contained heroin, hidden in the shafts, which was seized by the officers.[4]

Everett recognized Roupinian's voice as the voice of the person from whom he had received the telephone calls.

After the trial had been concluded the court, as we have said earlier, found Roupinian guilty and acquitted Rimbaud on the substantive count. Roupinian's guilt is clear. He had the heroin in his possession,[5] he did not explain that possession, and there was no need to buttress the case against him by the proof that he had other heroin in his apartment, heroin the Customs Service stickers showed had been imported from France.

We now turn to a discussion of the attacks upon the convictions under the conspiracy count.

When the trial judge found Rimbaud not guilty under Count 1, he stated:

> As to count 1, the Court further finds Eduardo Rimbaud not guilty, the government having failed to prove beyond a reasonable doubt that Rimbaud had power to control the disposition of the drugs such as to constitute constructive possession, the government having failed to prove that Rimbaud was not a mere casual facilitator who only knew a source of drugs, but who lacked a working relationship with the

---

3. This statement seems unworthy of belief. A message was undoubtedly smuggled out to someone on the outside, but Hysohion was represented by reputable counsel of the Legal Aid Society.

4. A pre-trial motion to suppress the seized heroin was denied after a hearing held February 3, 1970, and trial commenced the following day.

5. "To possess heroin *is* to possess imported heroin." Turner v. United States, 396 U.S. 398, 416, 90 S.Ct. 642, 652, 24 L.Ed.2d 610 (1970).

principal that enables an assurance of delivery.

We hold that this finding so jeopardizes Rimbaud's conviction on the conspiracy count as to require us to order his acquittal on that count also. We think that the district court's finding that Rimbaud was no more than "a mere casual facilitator" negates the court's finding that Rimbaud conspired to facilitate the Roupinian-Everett sale. While it is true that one co-conspirator need not actually personally deal in or custodially possess the narcotics themselves, the Government must prove an "unlawful agreement and an overt act committed in pursuance of the agreement." United States v. Agueci, 310 F.2d 817, 828 (2 Cir. 1962), cert. denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). We find no evidence in the record and nothing in the findings below which would support the existence of an unlawful agreement. The fact that Rimbaud told Everett, a willing buyer, how to make contact with a willing seller does not necessarily imply that there was an agreement between that seller, who was Roupinian, and Rimbaud.

■ However, even if the existence of an unlawful agreement be assumed, the conspiracy convictions of Rimbaud and Hysohion must be reversed because the Government failed to prove that these two appellants knew that the heroin offered for sale had been illegally imported. Section 174 prohibits various activities in narcotic drugs which a person knows to have been illegally imported,[6] and provides that one's actual or constructive possession of a narcotic drug raises a presumption of his knowledge of an illegal importation.[7] While the statute also makes criminal the separate act of conspiring to commit the prohibited substantive offenses, United States v. Agueci, *supra;* United States v. Galgano, 281 F.2d 908 (2 Cir.), cert. denied, 366 U.S. 967, 81 S.Ct. 1929, 6 L.Ed.2d 1257 (1961), we must heed the Supreme Court's admonition that "[c]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself," Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959) (emphasis in original). Thus, "the same specific knowledge [by the defendant that the drug was illegally imported] is also an essential element of the conspiracy to commit such substantive offenses." Jefferson v. United States, 340 F.2d 193, 197 (9 Cir. 1965) ; see also United States v. Puco, 436 F.2d 761, 762–763 (2 Cir. 1971) ; United States v. Febre, 425 F.2d 107, 112 (2 Cir.), cert. denied, 400 U.S. 839, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970) ; Palomino v. United States, 318 F.2d 613, 615 (9 Cir.), cert. denied, 375 U.S. 932, 84 S.Ct. 335, 11 L.Ed.2d 264 (1963) ; Hernandez v. United States, 300 F.2d 114, 120 (9 Cir. 1962).

■ The record before us discloses no direct proof, and no inferential proof from the fact of Roupinian's possession, that either Rimbaud or Hysohion knew that the narcotics seized from Roupinian had been illegally imported. The specific finding below that Rimbaud lacked actual possession or sufficient control to be deemed in constructive possession [8] of

---

6. Section 174 has now been repealed, and the present law has eliminated knowledge of illegal transportation as an element of narcotics offenses. See §§ 401, 404, and 1101(a) (2) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, 84 Stat. 1291.

7. "To possess heroin *is* to possess imported heroin." Turner v. United States, 396 U.S. 398, 416, 90 S.Ct. 642, 652, 24 L.Ed.2d 610 (1970). *Turner* does not remove the requirement that one's knowl-

edge of illegal importation must be proven with respect to heroin even though no domestic heroin is produced. See also United States v. Gonzalez, 442 F.2d 698 (2 Cir. May 14, 1971) (in banc).

8. See United States v. Febre, *supra*; United States v. Jones, 308 F.2d 26 (2 Cir. 1962) (in banc) ; United States v. Hernandez, 290 F.2d 86 (2 Cir. 1961) ; United States v. Santore, 290 F.2d 51 (2 Cir. 1960) (in banc).

the narcotics does not permit of reliance upon the presumption of knowledge permissible in Section 174 if such possession be first shown. That Roupinian had actual possession of the narcotics is immaterial to the charge of conspiracy against Rimbaud because possession in a codefendant is not sufficient to invoke the statutory presumption against an alleged co-conspirator of the possessor. Constructive or actual possession "must be shown with respect to each individual conspirator, facilitator, or aider and abettor." United States v. Hernandez, 290 F.2d 86, 90 (2 Cir. 1961); see also United States v. Puco, *supra,* 436 F.2d at 763; United States v. Febre, *supra,* 425 F.2d at 112; United States v. Santore, 290 F.2d 51 (2 Cir. 1960) (in banc). Thus, the Government has failed to prove that Rimbaud had any knowledge that the narcotics seized from Roupinian were illegally imported.

In the case of Hysohion who was not charged with a substantive offense but was only charged as a defendant coconspirator with Roupinian and Rimbaud, there also was no direct proof of knowledge of illegal importation and no evidence of actual possession of the narcotics. Thus, his conviction can be sustained only on a showing that he had constructive possession of the narcotics. In United States v. Jones, 308 F.2d 26, 31 (2 Cir. 1962) (in banc), we concluded that a defendant lacks constructive possession if he does "nothing except to introduce a willing buyer to a willing seller and to serve as a go-between until such time as the willing seller and willing buyer [are] satisfied to do business with each other." The defendant in *Jones* was not shown to have had any independent control over the narcotics or over the actual seller or shown to be in a position to assure the buyer that he could provide the drugs. Here, although there is some suggestion that Hysohion had the "final say as to the means of transfer," United States v. Febre, *supra,* 425 F.2d at 111, the same conclusion of lack of constructive possession is compelled, especially because the

transfer was not made in June as Hysohion said it would be made (or in May —Rimbaud's date), but at the end of July, and there was the very real possibility that the delivery system was devised by the seller, Roupinian. Therefore, the Government has also failed to sustain its burden of proof with reference to Hysohion.

Finally, inasmuch as the conspiracy convictions of Hysohion and Rimbaud are being reversed for lack of proof that either of them exercised any dominion over the heroin, Roupinian remains as a single "conspirator," and therefore his conspiracy conviction must also be reversed.

Roupinian's conviction on Count 1 is affirmed and the convictions of all three appellants on Count 2 are reversed.

MOORE, Circuit Judge (concurring):

In my opinion, the Trial Court was justified in finding that a conspiracy existed in fact. Hysohion in Rimbaud's presence told Everett that "they" could supply him with drugs. The ways and means were communicated by them to Everett. Rimbaud's subsequent offer to provide two kilograms by these same ways and means, say the majority, "does not necessarily imply that there was an agreement between the seller, who was Roupinian, and Rimbaud." Of course, the facts do not "necessarily" imply an agreement but they do not "necessarily" imply that there was no arrangement between them. In other words, I would accept the Trial Court's conclusion from the evidence.

The artificiality of the presumption body of law as to knowledge of illegal importation is apparent from the many conflicting decisions on this subject. Section 174 has now been repealed. Little value, therefore, is to be found in trying to fit the facts here disclosed into one of the various molds cast in other cases. The Trial Court derived one inference from the facts, the majority here another. Specific knowledge that

the drugs were illegally imported was not presented. Nor will I quarrel with the majority's conclusion that the proof of constructive possession was probably too weak to support such a finding. I, therefore, *dubitante* concur.