**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Randall J. LEE, George Grindrod and**
**Gregg Parker Lyell,**
**Defendants-Appellants.**

No. 80–5224.

United States Court of Appeals,
Eleventh Circuit.

Jan. 3, 1983.

Certiorari Denied April 18, 1983.
See 103 S.Ct. 1779.

H. Jay Stevens, Asst. Federal Public Defender, Orlando, Fla., for Lyell.

Bruce S. Rogow, Nova University Law Center, Fort Lauderdale, Fla., for Grinrod.

Richard L. Wilson, Orlando, Fla., for Lee.

Robert A. Leventhal, Donald E. Christopher, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before TJOFLAT and CLARK, Circuit Judges, and MILLER *, Judge.

CLARK, Circuit Judge:

Gregg Parker Lyell, George Grindrod, and Randall J. Lee appeal their convictions under 21 U.S.C. §§ 960 and 963 for conspiracy to import cocaine into the United States. We affirm their convictions.

The bizarre story opens in late 1977 when defendant Lee commented to Luis Edwards Vergara that he was looking for a cocaine buyer. Vergara mentioned this conversation to a friend of his, Jim Brewer, who passed along the name and number of "Tony Wingo" (undercover agent Herb Williams) to defendant Lyell, who was acting in concert with Lee. Lyell called "Tony Wingo" and arranged a meeting to discuss "South American products."

At this meeting, Lyell identified the "South American products" as "pink champagne," a slang term for cocaine. Lyell indicated that it would cost $20,000 for an introduction to a Peruvian cocaine producer and that the cocaine would be available for $13,000 per pound. Over the next few days, Lyell had several meetings with "Wingo" as well as with "Reno" (undercover agent Peter Scrocca) and "Georgie" (undercover agent John Ellis). During these meetings, Lyell indicated that one hundred kilos of cocaine were available for sale. Further, he indicated that his sources in Peru agreed to deliver the cocaine to Orlando or Miami at $23,000 per kilogram.

On January 17, at a meeting in Kissimmee, Lee joined the negotiations. Lee announced that for $20,000 he would intro-

---

* Honorable Jack R. Miller, Judge for the U.S. Court of Customs and Patent Appeals, sitting     by designation.

duce them to a source in Lima and that they would get "top quality merchandise." Lee then informed Grindrod of the day's events.

In meetings afterward, Lee tried to convince the agents that his proposed movie, "The Marksman," would provide an excellent front for their smuggling operations and repeatedly attempted to sell them shares in it. The agents, posing as Mafia chieftains, rejected all such solicitations and pressed negotiations for the cocaine sale.

A long series of meetings then commenced. Lee attempted to get the agents to invest in his movie, but continued to promise to secure them a cocaine source in return for $20,000. It was arranged that Grindrod, a pilot for Braniff Airlines, would fly down to Peru and make the arrangements for the agents to meet the Peruvian source, Juan Lujan. Lee was paid the $20,000.

Grindrod met several of the agents at the Hotel Carillion in Lima on February 7, 1978. The agents met with Lujan, and Grindrod showed them how cocaine could be smuggled into the United States inside the leather backing of llama rugs. The actual attempt to buy cocaine failed when Lujan announced that his deliveryman with a sample was not going to arrive. The agents then returned to Miami.

Further meetings were held between the agents and both Lee and Grindrod. During one of these meetings, Lee introduced MacLester Snow, who offered "Wingo" help in solving the problems that had developed. Later, Lee offered to sell his business, "The House of Llama," so it could be used by Wingo as a front to smuggle cocaine.

On March 1, 1978, Grindrod turned over to agents 7/10 of a gram of cocaine which tested out at 100% pure. Grindrod informed the agents that this was a sample of the cocaine that they would purchase. Lee attempted to facilitate negotiations between Lujan and the agents, specifically in the area of how Lujan would be paid for his cocaine. Lee did make clear that he would not physically get involved in the discussions between Lujan and the agents. Lee also set the price for the delivery of the cocaine at $12,000 per kilo, which did not include the $13,000 per kilo to be paid to Lujan.

In late April, arrangements were made for a cocaine sale to be transacted in Lima. This deal fell through, but new arrangements were made and the agents met Grindrod on May 7, 1978 at the Hotel Cesar in Mira Flores, Peru. This trip, however, also proved fruitless as Lujan called off the deal when he became aware of the Peruvian investigative police watching the Americans.

After this point, the deal began to fall apart. On July 17, 1978, the agents told Grindrod they wanted their $20,000 back. On July 26, 1978, Grindrod returned $6,500; Lee explained that he had no money left to return. Lee stated that of the original $20,000, he kept $6,500; Grindrod got $6,500; $5,000 went into "The House of Llama"; and $2,000 went to Lyell. Thus, $13,500 was not recoverable.

On October 12, 1978, Grindrod and Lee made one more attempt to connect the agents and Lujan. This too fell through and the agents broke off contact. On July 25, 1979, Grindrod, Lee, and Lyell (as well as several other individuals) were indicted by the Orlando grand jury and charged with conspiracy to import cocaine into the United States.

The appellants allege that the evidence is insufficient to convict them of conspiracy to import cocaine into the United States. At most, the appellants contend, there was an agreement to provide the name of the Peruvian drug connection. Lyell argues that this argument is especially applicable to him as he claims he withdrew from the conspiracy in January, long before the sample of cocaine was delivered. The appellants present a case out of New York, *United States v. Hysohion*, 448 F.2d 343 (2d Cir.1971), as authority. *Hysohion* stands for the proposition that a man can bring together a willing buyer and a willing seller without necessarily creating a conspiracy.

The Eleventh Circuit, in reviewing the sufficiency of the evidence to support a criminal conviction, inquires whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc).[1]

The essential element of a drug conspiracy is an agreement by two or more persons to violate the narcotics laws. *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir.1982); *United States v. Spradlen*, 662 F.2d 724, 727 (11th Cir.1981). The existence of such an agreement may be proved by circumstantial evidence, such as "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Id*. A person need not have knowledge of all the details of a conspiracy; proof is required only that he knew of the essential objective of the conspiracy. *United States v. Tamargo, supra*, 672 F.2d at 889; *United States v. Hernandez*, 668 F.2d 824 (5th Cir.1982). Moreover, the "defendant may be found guilty of conspiracy ... even if he plays only a minor role in the total scheme." *Id.; see also United States v. Hirst*, 668 F.2d 1180, 1185 (11th Cir.1982).

The evidence in this case, viewed in the light most favorable to the government, supports the convictions of the appellants. Grindrod traveled to Peru to facilitate the drug deal, he showed the agents how they might smuggle drugs into the country in llama skins, he produced a sample of cocaine in Miami, he paid the agents $1,000 to defray their expenses on their unsuccessful trip to Lima and remarked that Lujan would pay him back, as well as numerous other acts which indicate his guilt. Lee was in close contact with Grindrod throughout this whole period and had knowledge of his actions, he was concerned about facilitating the remittance of payment from the agents to Lujan, and he negotiated the price of the delivery of the cocaine, to name but a few of his activities that indicated Lee conspired to import the drugs into the country. Lyell, among other acts, informed the agents of the price of the cocaine, he guaranteed its quality, he announced the 100 kilos were available for sale, he acted as an intermediary between Grindrod who was in Peru making arrangements with Lujan and the agents, and he was a party to conversations where schemes to import the cocaine were discussed. Given this extensive involvement on the part of the appellants, it is clear that they did considerably more than just facilitate the meeting of willing buyers and sellers. Therefore, we find *Hysohion* inapposite. We hold that the evidence was sufficient to convict the appellants of conspiracy to import cocaine into the United States.[2]

Lyell raises an argument that the trial court erred in finding by a preponderance of the evidence that he was a member of the conspiracy charged, and thus admitting hearsay statements against him. This argument has no merit. We have already held that the government presented evidence sufficient to prove beyond a reasonable doubt that a conspiracy existed and that Lyell was a part of it. Necessarily, therefore, the government must have proved by a preponderance of the evidence that Lyell was part of a conspiracy to import cocaine.

Lyell also maintains that the trial court erred in denying his motion for mistrial based upon the admission of a state-

---

1. We are bound by all en banc decisions of the Unit B division of the former Fifth Circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982) (corrected opinion).

2. All the appellants urged us to give careful consideration to the tape of the January 25 meeting between Lee, Lyell and the agents. We have given the tape careful study and have concluded that it in no way exonerates any of the appellants. While certain comments made by Lee tend to show that he did not intend to import cocaine, these statements cannot be viewed in isolation. Other statements were made by Lee during the meeting which indicated his willingness to facilitate the importation of cocaine into the United States. Further, as noted above, the January 25 meeting was only one of a series of meetings. The examination of all the tapes makes the conclusion inescapable that Lee, Lyell, and Grindrod voluntarily attempted to import cocaine into the United States.

ment in a taped conversation that implied he had been in prison before. Specifically, the complained of statement was Lee's comment to one of the agents that Lyell "gets involved in stuff that's gonna, you know, wind him back in the slammer, and, ahh, if, if you get too involved with some of his crazy things, ah, you know, he'll drag a lot of other people down." Lyell argues that since he put on no evidence under Federal Rule of Evidence 404(a), evidence of bad character could not be used to impeach him.

We decline to accept Lyell's view of this issue. A number of factors indicate that he should not prevail. His counsel reviewed the tape in question prior to its being played for the jury. He made no objection prior to its admission. Second, his attorney declined the trial judge's offer to give a curative instruction. Third, the prosecution presented a large number of tapes, representing literally months of telephone conversations and meetings. Thus, it is clear that this particular tape was not presented in order to attack Lyell's reputation, but was simply one of a series showing the development of the conspiracy. Lastly, the sheer volume of evidence, both against Lyell and the other appellants, was so great as to make the isolated comment insignificant. Under *United States v. Franklin,* 586 F.2d 560 (5th Cir.1978), and *United States v. Roland,* 449 F.2d 1281 (5th Cir.1971), it has been established that the admission of such a statement does not require automatic reversal. Rather, as in *Roland,* we conclude that Lyell suffered no significant prejudice thereby. Given the clear evidence of his guilt and the isolated nature of the comment, we hold that Lyell's motion for mistrial was properly denied.

■ Both Lee and Grindrod argue that the trial court erred in not giving an entrapment instruction. We hold that the district court properly denied the instruction in both cases.

■ It is settled in this circuit that the defendant must produce evidence that shows government inducement. Further, the nature of the required showing is that some evidence must be shown, but more

than a scintilla must be presented. *United States v. Reyes,* 645 F.2d 285 (5th Cir.1981). If this level of evidence is met, then the entrapment instruction should be given.

■ For entrapment to exist, the criminal design must originate with government officials, and it is they who must plant the criminal design in the mind of an innocent man. *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *United States v. Webster,* 649 F.2d 346 (5th Cir.1981). We turn now to the question of whether the appellants met the *Reyes* standard.

The criminal design clearly originated with Lee. It was Lee who sent out agents looking for cocaine buyers. There is no evidence that the importation scheme originated with the government, and numerous acts point to Lee's predisposition to commit the crime. Thus, Lee's arguments are completely inapposite and meritless, and he was not entitled to an entrapment instruction.

Grindrod argues that the government "entrapped" him. Specifically, Grindrod argues that he played along with the scheme to "save Lee's skin." He maintains that he had no desire to smuggle cocaine into the country. Rather, according to his brief:

His theory of defense was that his participation in the activities upon which the charge was based was occasioned by the government agents' threats and coercive tactics directed to his friend, Randy Lee, who became involved with the agents and then, frightened by them, sought Grindrod's help in acting out a scheme which had no ability to produce cocaine.

Most of the important facts in this case are not disputed. There is no doubt that Randall Lee, Gregg Lyell, and George Grindrod spoke to and met with DEA agents regarding cocaine. The disputes center around the defendants' motivation and the court's failure to submit to the jury the theory of defense advanced by Mr. Grindrod, whose role commenced only after Randy Lee took $20,000 from government agents who told him "Some-

body's gonna die" unless the agents got "results."

Grindrod's brief p. 3.

Grindrod was not induced by government officials to join the conspiracy. Perhaps, he was "induced" by Lee to do so. As the Fifth Circuit stated in *Henderson v. United States,* 237 F.2d 169, 175 (1956), the doctrine of entrapment does not extend to acts of inducement on the part of a private citizen who is not a government official. Moreover, Lee was neither an agent of the government officials, *Pearson v. United States,* 378 F.2d 555, 560 (5th Cir.1967), nor an unsuspecting third party passing on an inducement upon Grindrod by government officials, *Johnson v. United States,* 317 F.2d 127, 133 (D.C.Cir.1963). Such inducement as may have been made upon Grindrod originated with Lee, who was subjected to threatening conversation by the undercover government officials. However, Lee was not induced and had no entrapment defense. Grindrod cites *United States v. Valencia,* 645 F.2d 1158, 1168 (2d Cir.1980), where the court said:

> If a person is brought into a criminal scheme after being informed indirectly of conduct or statements by a government agent which could amount to inducement, then that person should be able to avail himself of the defense of entrapment just as may the person who receives the inducement directly.

However, any indirect "inducement" in that case by undercover government officials through defendant William Valencia's wife was upon the defendant William Valencia and originated with the government officials, so that case is not apposite. Therefore, we hold that the court below properly denied the requested entrapment defense instruction.

 We note that the root of Grindrod's defense is grounded in duress, not entrapment. However, Grindrod had numerous reasonable opportunities to inform the police of the deal with the "Mafia" and thereby "save" Lee. He failed to take advantage of such opportunities. This precludes any duress defense. *See, e.g., Rhode Island Recreation Center v. Aetna Casualty and Insurance Co.,* 177 F.2d 603 (1st Cir. 1949); *State v. St. Clair,* 262 S.W.2d 25 (Mo.1953); W. LaFave & A. Scott, Criminal Law 378, 379 (1972). Further, there was no indication that Lee was threatened with *imminent* physical harm, also a requirement of the duress defense. Thus, when faced with a duress defense which had to fail, the appellant Grindrod was forced to attempt an entrapment defense, which was equally doomed to failure.

We have examined all of the appellants' contentions and have found them to be without merit. Consequently, affirmation of their convictions is required.

AFFIRMED.