UNITED STATES of America, Appellee,

v.

Serge Christian HYSOHION and Eduardo Rimbaud, Appellants.

Nos. 355, 356, Dockets 34409, 34410.

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1970.

Decided March 9, 1971.

Robert Hermann, New York City, (Milton Adler, Legal Aid Society, New York City), for appellant Serge Christian Hysohion.

Theodore Krieger, New York City, for appellant Eduardo Rimbaud.

Arthur J. Viviani, Asst. U. S. Atty., (on the brief), for appellee. Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, Charles B. Updike and Jack Kaplan, Asst. U. S. Attys., on the brief), for appellee.

Before WATERMAN and MOORE, Circuit Judges, and LEVET, District Judge.*

LEVET, District Judge:

This is an appeal by Serge Christian Hysohion (Hysohion) and Eduardo Rim-baud (Rimbaud) from judgments of conviction entered on December 23, 1969 in the United States District Court for the Southern District of New York (Cannella, D. J.) convicting said Hysohion and Rimbaud after trial by jury on both counts of a two-count indictment. This indictment charged each of said defendants with (1) receiving, concealing and facilitating the transportation and concealment of approximately 22 kilograms of heroin, and (2) a conspiracy to do so in violation of Title 21 U.S.C.A. §§ 173 and 174. Each defendant was sentenced to a prison term of 20 years on count 1 and 10 years on count 2, to be served consecutively.

Hysohion, who admitted his guilt of the substantive offense during his testimony at trial, urges that his conviction on count 2 be reversed on the grounds that Judge Cannella, in his charge, exceeded the bounds of permissible comment in two respects: First, by characterizing an essential part of the defense in a manner prejudicial to the defense, and, second, by assuming a set of facts contrary to the evidence.

Rimbaud relies on these same alleged errors to challenge his conviction on both counts of the indictment. In addition thereto, he alleges error on the ground that the summation by the prosecutor exceeded the reasonable bounds of fair comment.

We affirm both judgments.

On February 24 and 25, 1969, agents of the Bureau of Customs went to a pier in Brooklyn and conducted a search of seven hundred cases of canned fish which had been imported from Spain and which were consigned to Panamanian Chemical and Food Products, Inc. ("Panamanian"). It was discovered that five of these cases of "fish" contained heroin. The shipment was not seized at that time. Panamanian, conducting its "business" in a private house in Whitestone, Queens, New York,

---

* United States District Court for the Southern District of New York, sitting by designation.

had been incorporated by Hysohion as a front for the importation of narcotics, pursuant to instructions given him in Switzerland prior to his arrival in the United States.

On March 7, 1969, the cases of canned fish were removed from the pier to the corporate premises of Panamanian and on the same day Hysohion sent a telegram to Rimbaud, then in Paris, requesting that he immediately come to New York. Rimbaud did so. The purpose of Hysohion in sending this telegram and of Rimbaud's subsequent arrival in New York was disputed at trial. It was Rimbaud's contention that his journey to the United States had nothing to do with the narcotics traffic but, instead, was for the purpose of finding a publisher for certain detective stories he had written. Rimbaud arrived the following day, March 8, 1969, and checked into a hotel in Manhattan, where he was met by Hysohion. They both proceeded to the address of Panamanian in Queens, at which the cans of fish and heroin had been delivered.

The next morning agents in a specially constructed surveillance van observed Rimbaud leave the house at about 5:00 A.M., whereupon he spent about 15 minutes looking into all the cars parked in the vicinity of the house. Rimbaud returned to the house and about 15 minutes after that both Hysohion and Rimbaud (who was carrying a leather bag) left the premises and entered a taxicab. A short distance away, the cab was stopped and Rimbaud and Hysohion were arrested by Customs agents. The leather bag was found to contain twenty plastic bags packed with twenty-two kilograms of heroin of 98% purity.

At trial, on cross-examination of Hysohion, the government introduced into evidence a manuscript seized in Rimbaud's hotel room. The government's position was that Rimbaud's claim, that he came to the United States to submit a manuscript to a publisher, was discredited by reason of the shabby condition of the manuscript.

It is the court's reference in its charge to this manuscript that forms the basis of one of appellants' arguments for reversal. It is claimed that the court adopted the government's characterization of the manuscript as "garbage."

■ The specific part of the charge to which the appellants now object and to which objection was taken at trial is set forth in the note below.[1] This portion of the charge clearly was not an adoption of the government's characterization of the evidence. Quite to the contrary, it appears as a conscious attempt on the part of the court to caution the jury not to reject the appellants' contentions out of hand. At any rate, it in no way constituted error on the part of the trial court.

■ The appellants' second point with respect to the charge is that Judge Cannella, in his comments to the jury, "assumed a set of acts contrary to all the evidence."

The defense set forth at trial was based in large part upon the contention that Rimbaud came to this country on Saturday, March 8, 1969, looking for a publisher. He and Hysohion were arrested, however, early Sunday morning March 9, without having attempted to contact either a publisher or Moses Acosta, a friend of Hysohion who was supposed to help Rimbaud find a pub-

---

1. "What about the garbage that Mr. Tendy has been talking about in that manuscript there. Well, what about Lincoln on the train, the apocryphal story that when he went to Gettsburg [sic] he remembered that he had to say something there and he looked around for a piece of paper and he found an envelope in his pocket and on the back of the envelope he scribbled what has now become Four Score and Seven Years Ago, a tremendous address. You think a publisher would have bought that piece of garbage as you might call it? I don't know. Maybe a publisher would buy something like this" (R. 751, November 26, 1969).

lisher. The court commented upon this failure to call Acosta in the following manner:

" * * * In a sense, he said he came over here because he had a manuscript and he wanted to see whether he could get it published and Hysohion indicated that he could. But let's analyze that a bit. Did you ever hear Hysohion say that they ever called Acosta up on Saturday or Sunday? All right. Saturday he could say 'I know he was up skiing. There was no sense in calling him.' But did he ever call him on Sunday? This is what he came here for, the manuscript.

" * * * they are talking aout 53 million other things, but never a word said about 'Let's call Acosta up and find out about the publisher.' And here is Hysohion leaving at 5 o'clock on Monday. When is he going to show him the publisher? * * * So you take that into consideration in determining whether Rimbaud knew what was going on" (R. 748–749, November 26, 1969).

Appellants argue that these comments on the evidence, to which objections were made at the time, assumed a set of facts contrary to the evidence since, it is claimed, the evidence made it clear that there was no time for Rimbaud to call Acosta.

We agree that the facts concerning this matter, as elicited at trial, point to a plausible reason why no phone call was made. Acosta had testified that he was in upstate New York skiing on Saturday, so there would not be much point calling him that day. The appellants were arrested at 6 o'clock in the morning on Sunday, leaving them scant time to attend to such business that day.

Nevertheless, while it was ill-advised for the trial judge to make these comments, we find no ultimate prejudice to the appellants and no reversible error.

Primarily, we consider the overwhelming evidence of guilt developed at trial. Were the evidence even slightly less conclusive, a close analysis of the possible effect of these comments would be required. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 240, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Grunberger, (2nd Cir., 1970) 431 F.2d 1062.

A second consideration, which would not in itself be controlling were the balance of the evidence different, is that the absence of a phone call was only one of many factors Judge Cannella touched upon in directing the jury's attention to the elements of the first count of the indictment. This one misplacement of emphasis stands alone in an otherwise quite accurate and fair charge to the jury.

Furthermore, the jury was clearly advised as to its independent role as fact finder and, in fact, even this particular part of the charge, which is in dispute, was concluded with the following instruction:

"Take all the circumstances into consideration. The fact that I discuss some of them and don't discuss all of them is not to preclude you from discussing all of them, because you in arriving at a decision must discuss all of them * * *" (R. 749–750, November 26, 1969).

Appellant Rimbaud contends separately, and for the first time on appeal, having not raised the issue at trial, that as to him the prosecutorial summation exceeded the bounds of fair comment. Rimbaud claimed that the prosecutor improperly asserted his belief in his guilt.

The segments of the summation alluded to and the omitted sections which must be read together to indicate the actual tenor of the prosecutor's remarks are reprinted in the appendix at the end of this opinion. The claim is not supported by the record.

Unlike the remarks made by the prosecutor in United States v. Grunberger, *supra*, on which appellant relies, there was nothing in the prosecutor's remarks here to indicate to the jury that he was making "a statement of belief that the jury was expected to understand came

from the prosecutor's personal knowledge of, and from the prosecutor's prior experience with, other defendants, and as such [that] he was speaking as an expert based upon matter outside the record." United States v. Grunberger, 431 F.2d at 1068.

At most, what we have before us is the case of a prosecutor arguing with some degree of fervor that the defense put forward by the appellants was not supported by the evidence. We think it is not irrelevant that the record convincingly bears him out on this point. His comments, while emphatic, did not exceed the bounds of permissible comment.

Affirmed.

## APPENDIX

The passage reprinted below is that which is relied upon by Rimbaud in support of his claim of impropriety in the prosecutor's summation. The unitalicized portions represent that part of the summation to which the appellant specifically directs the court's attention. The italicized portions represent those parts omitted from appellant's brief and which are necessary in order to understand fully the character of the prosecutor's remarks.

"I asked myself, when I realized that we were going to be permitted to sum up tonight what it was that I would talk to you about. As a matter of fact, I had an extremely difficult time to refrain from standing up here and simply asking you what is there for me to say after you have heard the things that you have heard during the past seven or eight days. *What is there that I can add to it that will help you form an opinion as to the guilt or innocence of the charges as they have been alleged with respect to these two defendants. Frankly, I had a problem. Towards the end of Mr. Curley's summation, however, I resolved the problem, and this is what I suggest to you that I can legitimately and honestly say based on what has come out during the course of the trial and what you will be permitted to consider,* *and it is simply this. I submit to you that the defense which has been put up in this case is an insult to your intelligence and mine.*

"I noted a few things that were said by counsel during the course of summation. There aren't many of them, but I would like to touch on them briefly. I think that probably, exclusive of Hysohion's testimony on the stand, they would appear to form the guts of the defense here. Argument No. 1, the difference in the time of the surveillance of Rimbaud on that Sunday morning when he was walking around the block. Agent Willey testified, as I recall, to a 15 or 20 minutes period, and Agents Coyne and Seeley testified, as I recall, to a period of between 30 and 40 minutes. Whatever the actual testimony was, if you have any doubt about it, it is a matter of record and it will be available to you.

"Unquestionably there is a discrepancy in the time and unquestionably, as Mr. Curley suggested to you, this discrepancy is caused by the fact that the people involved were human beings. There isn't any question, however about what they saw this man do, and unanimously they say they saw him checking automobiles as he walked around the entire block, back and forth on either side of the street, during that period of time, whether it was 15 minutes or 30 minutes or 30 hours. Nobody questions that, and they can't. What does that do to that prop of their defense. It destroys it.

"Secondly, I made a note of the fact that Mr. Curley emphasized the testimony of Mr. Acosta. Mr. Acosta testified on cross-examination that he was not served with a subpoena. However, under their withering further attack they elicited from him the fact that Agent Seeley did in fact have a subpoena in his pocket and he never told anybody that, Acosta didn't. There is the effrontery to suggest to you that this destroys Acosta's credibility. I think that the Judge during the period of time when

he talks to you after summations will tell you that one of the things you have to take into consideration when you weigh the testimony of a witness is the person's appearance on the stand.

"Mr. Curley suggested to you that all of the governmental evidence which was brought to your attention up until the approximate time of the arrest on Sunday morning, to wit, the lengthy difficult examination on the pier, the surveillance over that period of time from February 22nd to 24th until March 7th, when it finally left the pier, when it was delivered to the house, the long, arduous surveillance on the part of agents during the period of time between the delivery on the evening of March 2nd until the early morning hours of Sunday, was all, and I quote him, trivia. That is an outrageous suggestion. *They don't dare challenge any portion of this thing because it is mathematically incapable of challenge. The evidence that the government produced up to that point, and I will use that point as a jumping off spot in just a moment, is mathematically, I suggest to you, unchallengeable. The documentation which refers itself directly to the house at Whitestone, the fingerprints on the can during the period of time that the can was in the house, the opening of these cans, and I forget the exact number—and you are free to examine these exhibits; the covers are still in there—all of these things which were established through competent, complete evidence on the part of government witnesses will not stand any challenge for even a second.* And it is suggested to you that you should consider this trivia. I suggest to you that as far as it goes and up to the point of the arrest on Sunday morning or the events of Saturday evening it lends credence, substance and body to everything that the government has said.

"*Now, so far with the exception of Hysohion's testimony this has been their attack on the government's case, and I think it is an outrage, and I repeat, and I repeat it advisedly, it is an insult to your intelligence*" (Tr. 695–699).

\* \* \* \* \* \*

"We have been through this for the past seven or eight days and I think that the Government's presentation of the evidence has been simple and straight-forward. Time doesn't permit me to go into all of the nuances that I can suggest for the purposes of argument from the many exhibits that are in evidence. They are all here. They are available for your examination in the jury room, the drawings and the numerical notations on the blackboard, and if there is any doubt about any question or fact I for one request you to request the right to examine these things. *As far as I can see, based on what has been brought to your attention and what the Court has permitted you to examine so far, to return with less than a verdict of guilty as to both of these defendants would suggest that the government, at least, on the basis of this type of evidence, is living an unreal dream.*

"*My argument is a very simple one. Hysohion said A, B and C. I say to you he hasn't done a single thing to prove it besides say it. On the contrary, everything that the government has come up with is collectively and individually suggestive of absolute complete mathematical guilt, and ladies and gentlemen, I suggest to you that reason, logic and common sense requires you to return with that specific verdict with respect to both of these defendants.*" (Tr. 713–714).