Haywood ERWING, Appellant,

v.

UNITED STATES of America, Appellee.

No. 18440.

United States Court of Appeals
Ninth Circuit.

Oct. 17, 1963.

Edgar Paul Boyko, Los Angeles, California, for appellant.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Criminal Section, and Russell R. Hermann, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, JERTBERG and KOELSCH, Circuit Judges.

JERTBERG, Circuit Judge.

Appellant appeals from his conviction on the second count of a two count indictment charging appellant in Count 1 with selling and facilitating the sale of 9 grams and 300 milligrams of cocaine, and in Count 2 with receiving, concealing, transporting and facilitating the transportation and concealment of the same cocaine on the same day, both offenses in violation of Title 21 U.S.C.A. § 174.[1]

The present appeal is from a retrial of the case, this Court having reversed the previous conviction. See Erwing v. United States, 296 F.2d 320 (9 Cir., 1961).

Appellant's specification of errors are

"I. The trial court lacked jurisdiction of the subject matter of this case, in that there was no evidence of unlawful importation of the drug cocaine hydrochloride, nor could such importation be legally or constitutionally inferred in this case without violating due process of law.

"II. The trial court lacked jurisdiction of the subject matter of this case because there was no clear and convincing evidence of possession by the appellant of any narcotic drug, such possession being a jurisdictional fact.

"III. The judgment and verdict on Count 2 of the indictment were contrary to the weight of the evidence and unsupported by substantial evidence.

"IV. The appellant was deprived of a trial by a fair and impartial jury because of his inability to adequately examine prospective jurors on their *voir dire*, and because of the trial court's denial of his motions with respect thereto, which constituted an abuse of the trial court's discretion under the special circumstances of this case. Moreover, and as a direct result thereof, the appellant was deprived of a trial by a fair and impartial jury by reason of the fact that the trial jury so selected was either unable or unwilling to, and did not in fact, follow the instructions of the trial court with respect to the law applicable to this case.

"V. The indictment herein failed to state facts sufficient to constitute an offense against the United States and, therefore, appellant's motions to dismiss the same and in arrest of judgment should have been granted."

We will first discuss appellant's first specification of error.

21 U.S.C.A. § 174 is designed to control the unlawful importation into the United States of "any narcotic drug." The term is defined in 21 U.S.C.A. § 171

---

1. "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law * * * shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. * * *

"Whenever on trial for a violation of this section the defendant is shown to have or have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

(a).[2] The matter relevant to this case appears in § 4731.[3]

The uncontradicted evidence as to the narcotic drug involved in this case established that it was cocaine hydrochloride. Such substance was received in evidence and marked Exhibit 4. On this subject the testimony of two expert witnesses was received, one of whom testified on behalf of appellee and the other one on behalf of appellant. We have examined the summaries of the testimony of these two witnesses as they appear in appellant's opening brief and appellee's brief, against the testimony appearing in the transcript. The following summary of the testimony of each witness has been taken mainly from the appellant's opening brief but supplemented in instances by resort to the appellee's brief.

Herman Meuron was produced as a witness in behalf of the Government and states that he is a chemist employed by the U. S. Treasury Department and previously by the United States Food and Drug Administration; that his specialty is in the field of organic analysis and that he has conducted numerous analyses of substances to detect the presence of narcotics; that he examined Government Exhibit No. 4 for the presence of narcotic substances; that he

tested the same for opium alkaloids and found none present; that he tested it for procaine or novocaine and that these tests likewise were negative. That thereafter, he conducted several tests for cocaine and that as a result of these tests he found the exhibit to contain pure cocaine; that cocaine is prepared from the leaves of the coca plant, which plant is commercially grown in Peru, Ecuador and Java; that all of the cocaine he had examined while a Government chemist was found to be pure unadulterated cocaine.

He further testified that he is familiar with the United States Pharmacopoeia, which is a book containing a compilation of chemicals and substances which are used by doctors in treating diseases or which are dispensed by druggists and which also lists minimum standards of purity and composition of such drugs and pharmaceuticals which are sold or prescribed in the United States or manufactured in the United States; that the United States Pharmacopoeia contains a listing for the drug known as cocaine and its approved standard of purity and composition. That it is not the drug cocaine which comes from Peru, Bolivia and Java, but rather the coca leaves which are commercially grown in those countries (and from which the raw ma-

---

2. "IMPORTATION OR EXPORTATION
"§ 171. Narcotic drugs; definitions
"When used in sections 173, 174, 176–184, and 185 of this title—
"(a) The term 'narcotic drug' shall have the meaning ascribed to the term 'narcotic drugs' by section 3228(g) of Title 26; the term 'isonipecaine' shall have the meaning ascribed to that term by section 3228(e) of Title 26; and the term 'opiate' shall have the meaning ascribed to that term by section 3228(f) of Title 26.
"(b) * * *
"(c) * * *
"(d) * * *."
This latter section was repealed and is now covered by 26 U.S.C.A. §§ 4731, 7343 and 7701(a).

3. Section 4731 in relevant part provides:
"§ 4731. Definitions
"(a) Narcotic drugs.—The words 'narcotic drugs' as used in this part shall

mean any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:
"(1) Opium, isonipecaine, coca leaves, and opiate;
"(2) Any compound, manufacture, salt, derivative, or preparation of opium, isonipecaine, coca leaves, or opiate;
"(3) Any substance (and any compound, manufacture, salt, derivative, or preparation thereof) which is chemically identical with any of the substances referred to in clauses (1) and (2);
except that the words 'narcotic drugs' as used in this part shall not include decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine. * * *."

terial for the drug is extracted); that some so-called crude commercial cocaine is also imported from these countries, but not pure, refined cocaine hydrochloride; that the raw materials for cocaine are mainly imported from South -America in one of two ways, namely, either the coca leaves themselves which are then processed in this country and (2) a kind of crude commercial cocaine which has been made by a very rough treatment of chopped up coca leaves in those foreign countries. That Government's Exhibit No. 4 does not contain coca leaves nor crude untreated cocaine extract from the leaves, but rather virtually pure cocaine, or rather a salt of the alkaloid cocaine known as cocaine-hydrochloride; that cocaine is an alkaloid which is a complicated organic compound, extracted from the coca leaves, and when so extracted is not in the form of the hydrochloride; that before the hydrochloride can be obtained, it is necessary to take the crude commercial cocaine and treat it with hydrochloric acid; that by such treatment a pure crystalline compound is obtained which is more soluble and therefore more readily administered for medical purposes. That he has no knowledge whether this country ever imports any cocaine hydrochloride from any of the foreign countries which he had previously mentioned; that he doesn't know which domestic companies manufacture cocaine hydrochloride; that he doesn't know whether coca leaves have been grown, in recent years, in the Gulf of Mexico states; that he is not familiar with the specific provisions in the United States laws which permit the lawful importation of coca leaves; that he has no knowledge whether or not cocaine hydrochloride, being the substance which he found in Government's Exhibit No. 4, is ever imported from any foreign country; that he did not make any tests to determine whether the cocaine hydrochloride in Government's Exhibit No. 4 was manufactured in the United States or imported from some foreign country and that he does not know any such tests that can be made.

Mr. Meuron further testified that cocaine may be legitimately used in this country for medicinal purposes; that he has read about its being used medically as a local anesthetic and in connection with eye examinations and dental treatments; that cocaine is not absolute contraband and unlawful to be manufactured or possessed in this country as is for instance heroin; that he does not know whether or not cocaine is an addicting drug in the same way as opium derivatives. That cocaine when used medically must be dispensed on a doctor's prescription. That the cocaine hydrochloride he found in Government's Exhibit No. 4 appeared to be pure and that he had no basis for, nor could he state affirmatively, that this particular sample that he examined did not come from a pharmacy or drug store or hospital dispensary in this country. That he "assumed" that pure or substantially pure cocaine may be produced in foreign countries; that he "imagined" that it is commonly in use throughout the world; that he has never seen crude cocaine, but "guesses" that the same contains impurities, including coloring, and does not consist of white crystals; that he does not know whether any cocaine is exported from the United States; that he does not know of any tests that would tell where cocaine contained in Government's Exhibit 4 would come from or where it would have been manufactured in the pure state.

That pure or crude cocaine on the one hand and cocaine hydrochloride on the other are entirely different things and that no amount of removing of impurities, coloring or vegetable substances from crude cocaine would turn it into cocaine hydrochloride; that cocaine must be treated with hydrochloric acid before it forms the hydrochloride, which is an additional compound and which is chemically different; that cocaine hydrochloride is not found free in nature in the coca leaf or in any other place to his knowledge; that cocaine hydrochloride is a man-produced pharmaceutical drug.

Andrew William Phillips, produced as a witness in behalf of defendant, testi-

fied as follows: He is a pharmacist registered in the State of California, licensed as such; that he also is licensed as a pharmacist and so registered in the State of Texas; that he holds two kinds of pharmacist's licenses in the State of California, namely, a pharmaceutical manufacturer's license and a registered pharmacist's license, which authorize and license him to both dispense and manufacture pharmaceuticals; that he is a graduate of an accredited school of pharmacy and that ever since graduation he has been engaged in that field, mostly in retail and manufacturing. That in his work as a pharmacist, he has become familiar with cocaine hydrochloride; that he has seen it in hospitals although he personally has not dispensed it as such; that he has worked in places where it was dispensed and where he had the chance to become familiar with the methods of its being dispensed; that in the course of his training and work he had occasion to become very familiar with the technical literature concerning this product and how it is prepared. That there is a difference between the product known as cocaine hydrochloride and the alkaloid cocaine as it occurs in nature or in a crude commercial state; that the alkaloid is the crude form of cocaine after it has been extracted from the coca leaves; that the hydrochloride is man-made byproduct of the natural cocaine; that of these two substances the hydrochloride is the one which is used for medicinal purposes; that the method of manufacturing hydrochloride from the raw alkaloid is to take coca leaves and extract the cocaine alkaloid from the coca leaves, which results in crude cocaine; that thereafter through chemical operations known as tirations, the hydrochloride radical is introduced into the product and the resulting new compound is then extracted by use of various other solvents; that production of cocaine hydrochloride from the crude cocaine alkaloid is a separate manufacturing process.

The witness further testified that the cocaine hydrochloride dispensed in this area and in this state comes generally from three major sources, namely the Merck-Sharp & Dohme Company, located in New Jersey and in Philadelphia, the Mallincrodt Chemical Manufacturing Company, and the Penna Company located in New York; that he knows of no manufacturer of cocaine hydrochloride in any foreign countries whose products are dispensed in this country; that the bulk of the cocaine hydrochloride dispensed in the Los Angeles area comes from the Merck Company; that the balance would come from Mallincrodt and Penna, the other manufacturers, all of which are domestic; that he has never seen dispensed or heard of there being dispensed in this area any cocaine hydrochloride that was not manufactured in the United States.

The witness further stated that cocaine hydrochloride is not an addicting drug although it may be termed "habituating", which means it creates a psychological rather than a physiological dependency; that cocaine hydrochloride is listed in the United States Pharmacopoeia and is a medicinal drug that may be properly and legitimately dispensed by physicians, druggists and pharmacists; that in recent years there has been a tendency towards substituting synthetic products for cocaine; that cocaine is generally used now in eye surgery for an anesthetic; also for ear, nose or throat; that most drug stores keep no more than two ounces of cocaine hydrochloride on hand for prescription purposes; that a drug store near an eye, ear, nose and throat clinic would carry more than a drug store not so located; that the ordinary drug store would generally carry about an ounce; that when a drug store obtains cocaine it must comply with government regulations pertaining to the control of narcotics; that a lay person would ordinarily have cocaine hydrochloride in a dilute solution, dependent in part on the patient's body weight; that the purpose of adding the hydrochloride radical to the cocaine alkaloid is to make it more easily soluble through the mucous membrane; that the crude cocaine alkaloid is not so soluble or usable. That he has had ex-

perience both in Texas and California; that he has never known of illegal cocaine to come into Texas or California from Mexico; that to his knowledge, the United States does not export cocaine.

That there are institutional users who use and stock cocaine hydrochloride in larger quantities than the average retail drug store, such as hospitals; that a hospital type dispensary would not stock the solution but would stock the crystals and make its own stock solutions through technicians and other personnel and would prepare these when the drug was needed; that this is because the solution deteriorates; that even a hospital would not be likely to carry more than three or four ounces; that a hospital would keep it under lock and key and be responsible to the Internal Revenue Inspector every four months, and that drugstores using any appreciable amount are carefully checked by the Government. That cocaine hydrochloride is the only form in which the drug is kept in a pharmacy or a hospital; that for ocular surgery and like purposes the cocaine hydrochloride is the only type sold; that there is a listing of cocaine alkaloid in the index but it is not dispensed in hospitals; that if the cocaine crystals were left exposed to the air or water long enough to deteriorate, the cocaine would lose its drug-like qualities and eventually become an inert or useless substance.

The count of the indictment of which appellant was convicted, and from which he appeals, alleges in relevant part that appellant "knowingly and unlawfully received, concealed, transported and facilitated concealment and transportation of 9 grams, 300 milligrams of cocaine, a narcotic drug which, as the defendant then and there well knew, previously had been imported into the United States of America contrary to United States Code, Title 21, Section 173." [4]

There is no dispute that the substance involved in this case is a narcotic drug as defined in the Statute. (See Footnote 3). For purposes of our opinion, we will assume that the evidence is sufficient to establish possession by the appellant of the cocaine hydrochloride.

It is to be noted that mere possession of a narcotic drug is not an offense under the Statute. United States v. Brown, 207 F.2d 310 (7 Cir., 1953); Rodella v. United States, 286 F.2d 306 (9 Cir., 1960), C.D. 365 U.S. 889, 81 S.Ct. 1042, 6 L.Ed.2d 199. Illegal possession of a narcotic drug is a criminal offense under the laws of the State of California. §§ 11500 and 11712 Health and Safety Code of the State of California.

Under the second paragraph of Section 174, quoted supra, the proof of possession of a narcotic drug by defendant shifts to him the burden of explaining such possession to the satisfaction of the jury. In the absence of such satisfactory explanation, the application of the statutory rule of evidence or prima facie presumption set forth in Section 174 shall be deemed sufficient to authorize conviction. In such circumstances the statutory rule of evidence or prima facie presumption furnishes sufficient proof to establish the illegal importation of the narcotic drug and the defendant's knowledge that the narcotic drug was illegally imported. Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (1925); Hernandez v. United States, 300 F.2d 114 (9 Cir., 1962); Cellino v. United States, 276 F.2d 941 (9 Cir., 1960); Caudillo v. United States, 253 F.2d 513 (9 Cir., 1952), C.D.

4. Section 173 in relevant part provides:
   "It is unlawful to import or bring any narcotic drug into the United States or any territory under its control or jurisdiction; except that such amounts of crude opium and coca leaves as the Commissioner of Narcotics finds to be necessary to provide for medical and legitimate uses only may be imported and brought into the United States or such territory under such regulations as the Commissioner of Narcotics shall prescribe, but no crude opium may be imported or brought in for the purpose of manufacturing heroin. All narcotic drugs imported under such regulations shall be subject to the duties which are now or may hereafter be imposed upon such drugs when imported. * * *"

357 U.S. 931, 79 S.Ct. 1375, 2 L.Ed.2d 1373.

The authority of Congress to prohibit importation of narcotic drugs, and as a measure reasonably calculated to aid in the enforcement of the prohibition to make its possession and concealment with knowledge of its unlawful importation a criminal offense, has long been established. See Yee Hem v. United States supra, in which smoking opium was the prohibited article.

The question presented to the court in that case was whether the Congress had the power to enact provisions in respect to the presumptions arising from the unexplained possession of opium and from its presence in this country after the time fixed by statute. On page 183 of 268 U.S., on page 471 of 45 S.Ct., 69 L. Ed. 904, the court quoted with approval the following from Mobile, J. & K. C. R. Co. v. Turnipseed, 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78:

"That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed."

The legislative provision assailed in Yee Hem v. United States were upheld. The Court stated at page 184 of 268 U.S., at pages 184–185 of 45 S.Ct., 69 L.Ed. 904:

"We think it is not an illogical inference that opium, found in this country more than four years (in the present case, more than fourteen years) after its importation had been prohibited, was unlawfully imported. Nor do we think the further provision, that possession of such opium in the absence of a satisfactory explanation shall create a presumption of guilt, is 'so unreasonable as to be a purely arbitrary mandate.' By universal sentiment, and settled policy as evidenced by state and local legislation for more than half a century, opium is an illegitimate commodity, the use of which, except as a medicinal agent, is rigidly condemned. Legitimate possession, unless for medicinal use, is so highly improbable that to say to any person who obtains the outlawed commodity, 'since you are bound to know that it can not be brought into this country at all, except under regulation for medicinal use, you must at your peril ascertain and be prepared to show the facts and circumstances which rebut, or tend to rebut, the natural inference of unlawful importation, or your knowledge of it,' is not such an unreasonable requirement as to cause it to fall outside the constitutional power of Congress."

The constitutionality of the rule of evidence created under the language contained in the second paragraph of Section 174, and similar provisions contained in 21 U.S.C. § 176a relating to marijuana, have been expressly or impliedly sustained in many cases involving opium, heroin and marijuana. See cases cited in Hernandez v. United States, supra.

■ No decision of a reviewing court has been called to our attention which had occasion to consider the applicability of the statutory presumption to the unexplained possession of the narcotic drug involved in this case, to wit: cocaine hydrochloride. There is in the record no direct evidence that the narcotic substance involved had been imported or brought into the United States contrary to law or to establish knowledge on the part of the appellant that the same was imported or brought into the United States contrary to law. In our view, under the evidence in this case, the unex-

plained possession by the appellant of cocaine hydrochloride is not sufficient to sustain an inference by the jury that the cocaine hydrochloride was illegally imported or brought into the United States, or that the appellant had knowledge of such illegal importation, without violating appellant's right to due process. Hence, the conviction of appellant can be lawfully sustained only if the rule of evidence created by the second paragraph of Section 174 may be constitutionally applied. In Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), there was involved the construction and validity of Sec. 2(f) of the Federal Firearms Act which provided: "It shall be unlawful for any person who has been convicted of a crime of violence or is a fugitive from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this Act."

At page 467 of 319 U.S., at pages 1244–1245 of 63 S.Ct., 87 L.Ed. 1519 the court stated:

"The rules of evidence, however, are established not alone by the courts but by the legislature. The Congress has power to prescribe what evidence is to be received in the courts of the United States. The section under consideration is such legislation. But the due process clauses of the Fifth and Fourteenth Amendments set limits upon the power of Congress or that of a state legislature to make the proof of one fact or group of facts evidence of the existence of the ultimate fact on which guilt is predicated. The question is whether, in this instance, the Act transgresses those limits.

"The Government seems to argue that there are two alternative tests of the validity of a presumption created by statute. The first is that there be a rational connection between the facts proved and the fact presumed; the second that of comparative convenience of producing evidence of the ultimate fact. We are of opinion that these are not independent tests but that the first is controlling and the second but a corollary. Under our decisions, a statutory presumption cannot be sustained if there be no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience. This is not to say that a valid presumption may not be created upon a view of relation broader than that a jury might take in a specific case. But where the inference is so strained as not to have a reasonable relation to the circumstances of life as we know them, it is not competent for the legislature to create it as a rule governing the procedure of courts."

Further on page 469 of 319 U.S., on pages 1245–1246 of 63 S.Ct., 87 L.Ed. 1519 it is stated:

"Nor can the fact that the defendant has the better means of information, standing alone, justify the creation of such a presumption. In every criminal case the defendant has at least an equal familiarity with the facts and in most a greater familiarity with them than the prosecution. It might, therefore, be argued that to place upon all defendants in criminal cases the burden of going forward with the evidence would be proper. But the argument proves too much. If it were sound, the legislature might validly command that the finding of an indictment, or mere proof of the identity of the accused, should create a presumption of the existence of all the facts essential to guilt. This is not permissible.

"Whether the statute in question be treated as expressing the normal

balance of probability, or as laying down a rule of comparative convenience in the production of evidence, it leaves the jury free to act on the presumption alone once the specified facts are proved, unless the defendant comes forward with opposing evidence. And this we think enough to vitiate the statutory provision."

From the teachings of Yee Hem and Tot, supra, we learn: that the due process clauses of the Fifth and Fourteenth Amendments set limits upon the power of Congress to make the proof of one fact or group of facts evidence of the existence of the ultimate fact upon which guilt is predicated; that a statutory presumption cannot be sustained if there is no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience; that where the inference is so strained as not to have a reasonable relation to the circumstances of life as we know them, it is not competent for the legislature to create it as a rule governing the procedures of courts; and that the comparative convenience of producing evidence of the ultimate fact is but a corollary to the requirement that there be a rational connection between the facts proved and the fact presumed.

If proof in this case had shown possession by the appellant of coca leaves or cocaine alkaloid extracted therefrom, we would have no difficulty in sustaining the conviction of the appellant. However, the proof established possession by the appellant of cocaine hydrochloride, a medicinal agent. Under the provisions of *Section 173* quoted *supra*, such amounts of coca leaves as the Commissioner of Narcotics finds to be necessary to provide for medicinal and legitimate uses only may be imported and brought into the United States under such regulations and as such Commissioner shall prescribe. The testimony of the two expert witnesses summarized above established that the narcotic drug involved in this case is cocaine hydrochloride, containing almost pure cocaine; that such substance is a manufactured product and is manufactured by extracting from the leaves of the coca plant the cocaine alkaloid, a raw cocaine, into which, by chemical operations, the hydrochloride radical is introduced, and the resulting new compound (cocaine hydrochloride) is then extracted by the use of various other solvents; that such substance is legally manufactured in the United States by at least three major pharmaceutical manufacturers; and that cocaine hydrochloric is a medical drug dispensed in drugstores, clinics and hospitals throughout the United States, and used for medicinal purposes. There is no evidence which indicates that any cocaine hydrochloride is imported into the United States, either legally or illegally. There is no evidence of any illegal manufacture of cocaine hydrochloride in the United States from coca leaves, legally or illegally imported.

Under the evidence furnished by the two expert witnesses, we are of the opinion that there is no rational connection between the unexplained possession of the cocaine hydrochloride and the presumed fact that such narcotic drug was illegally imported to the knowledge of the appellant, and that the inference of the one from the proof of the other is arbitrary because of lack of connection between the two in common experience. To do otherwise would be to disregard appellant's constitutional right to due process and extend the jurisdiction of the Federal Courts beyond constitutional limits.

The judgment of conviction is reversed, and the cause remanded to the District Court with instructions to dismiss the indictment.