Irving R. Kaufman, Circuit Judge, dissented and filed opinion.

Irving R. Kaufman, Circuit Judge, dissented and filed opinion on rehearing in banc.

Feinberg, Circuit Judge, dissented and filed opinion on rehearing in banc in which J. Joseph Smith, Circuit Judge, joined.

**UNITED STATES of America,**
**Appellee,**

v.

**Olga GONZALEZ, Elba Miranda and**
**Carlos Ovalle, Appellants.**

**Nos. 87–89, Dockets 33618, 33624, 33625.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 10, 1969.*

Decided Sept. 16, 1970.

On Rehearing In Banc May 14, 1971.

* Argued for Miranda and Ovalle, Oct. 10, 1969 and resubmitted as of January 30, 1970.

Submitted for Gonzalez on March 25, 1970.

Theodore Krieger, New York City, for appellant Miranda.

Phylis Skloot Bamberger, New York City, for appellants Ovalle and Gonzalez.

Olga Gonzalez, pro se.

David A. Luttinger, Gary P. Naftakis, Asst. U. S. Atty., Robert M. Morgenthau, U. S. Atty., for appellee.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

WATERMAN, Circuit Judge:

The three appellants, together with Emilio Massu, were charged in a two count indictment with, first count, having violated and, second count, having conspired to violate the federal narcotics laws, 21 U.S.C. §§ 173, 174. After a jury trial all four were convicted on both counts. Each of the three appellants took the stand and testified. Massu remained silent. Massu, Gonzalez and Miranda received sentences of five years' imprisonment on each count, the sentences to be served concurrently, and Ovalle was sentenced to concurrent six

year terms. Massu declined to file a notice of appeal. All four are serving their sentences.

In large measure the resolution of the defendants' guilt or innocence depended upon whether the jurors believed or disbelieved the government witnesses, for each of the appellants denied any connection with or knowledge of the illegal narcotics transaction in which the government witnesses testified they had been engaged.

The government evidence, however, quite conclusively proved that appellants were criminally involved. The government evidence brought out the facts now recited.

On December 16, 1968 Ovalle approached one Carmelo Viera, an informant in the employ of the Federal Bureau of Narcotics, to discuss the sale of a kilogram of cocaine. Viera was interested in buying it. Ovalle's price was $9,000. Viera, having shown interest in making a purchase, was next introduced to Massu, who assured Viera that the cocaine offered for sale was "a hundred percent pure," having been, by Massu himself, personally brought into the United States from Chile. Massu also stated that he imported cocaine about once a month "as a seaman" and, if Viera wished, he could bring him more in the future. Later in the day, after meeting with federal narcotics agents, informant Viera again met with Ovalle and told him a customer had been found willing to buy the cocaine kilo.

On December 18, in the morning, Viera met Ovalle and told him that the buyer would be ready at three, and, at three, Viera introduced Ovalle to the buyer, John Lepore, a Bureau of Narcotics agent, who promptly showed Ovalle $9,000 in cash. Ovalle then told Lepore he would return with the drugs later in the day and left, Viera accompanying him. Ovalle and Viera then met with Massu, Gonzalez and Miranda and it was arranged by them to have Lepore consummate the purchase at a hotel room where the imported cocaine was kept.

Massu and Gonzalez were left near the hotel, and Viera, Miranda and Ovalle proceeded to where Lepore was waiting. On the way Miranda told Viera in Ovalle's presence that she could get an additional five kilograms of cocaine by the end of January. Viera, Miranda and Ovalle directed Lepore to the hotel. Once the defendants, informant Viera, and agent Lepore had gathered in the hotel room, Gonzalez, at Massu's direction, removed a shopping bag from a closet and placed it on one of the beds. Massu then removed two cellophane bags of equal size, which upon later inspection were discovered to contain approximately 1,028 grams (over 2⅕ pounds) of cocaine, and handed one of the bags to the agent. Agent Lepore indicated he could not see through the wrapping, so Massu split the seal with a razor to facilitate a closer examination of the merchandise. While Lepore was inspecting the bag's contents Massu, Ovalle and Miranda fingered the crystalline substance and assured Lepore that the cocaine was pure and of good quality. Shortly thereafter the defendants were arrested. A search followed and a black leather suitcase with a false bottom was discovered. In it were an Argentinian Airlines ticket receipt reflecting a flight from South America to New York by Miranda, Miranda's Chilean Passport showing that she arrived in New York on November 27, 1968, and a Braniff Airways ticket receipt reflecting a flight from South America to New York by Gonzalez. These items were admitted into evidence. The four defendants are Chilean nationals. Both women testified to having traveled to New York in November, Miranda on the 27th, her first trip, and Gonzalez, who had previously been to New York, on the 24th to join Emilio Massu, her common law husband of 27 years.

Motions for a directed verdict of acquittal were made at the close of the Government's evidence and at the close of all the evidence. These motions were denied. A post-verdict motion to set aside the jury's verdict as having been

contrary to the weight of the evidence and against the applicable law and for a new trial was also made and denied.

Appellants challenge, on Fifth Amendment grounds, the inferences of illegal importation and knowledge of illegal importation which are allowed by the statute once "unexplained" possession of cocaine is established.[1] Although sufficient evidence was introduced at trial to warrant the jury to find beyond a reasonable doubt that the cocaine found in defendants' possession was illegally imported and the defendants knew it, the trial court instructed the jury that they could infer the "importation" and "knowledge" elements of the crime without relying on any evidence to support such inferences other than the evidence that the defendants possessed the cocaine.

The trial here was prior to the decision in Turner v. United States, 396 U. S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), and the charge was a proper one under the then existing law. In *Turner*, however, the Court ruled that possession of relatively small amounts of cocaine (in Turner's case less than one gram, i. e., substantially less than one-thousandth of the quantity here illicitly offered for sale) did not meet the constitutional test of the statutory presumption, saying:

> Applying the more likely than not standard employed in * * * [Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969)] we cannot be sufficiently sure that either the cocaine that Turner possessed came from abroad or that Turner must have known that it did. Id. at 419, 90 S.Ct. at 654.

The *Turner* Court went on to state, however, that possession of much larger amounts of cocaine than Turner had, amounts which it is claimed are too large to have been removed from legal channels and which must therefore have been smuggled, presented an issue better postponed "to another day, hopefully until the facts are presented in an adversary context in the district courts." *Id.* at 419, n. 39, 90 S.Ct. at 654.

■ Although in *Turner* the Government conceded and the Court found that "thefts [of cocaine] from legal sources, though totaling considerably less than the total smuggled, are still sufficiently large to make the § 174 presumption invalid as applied to Turner's possession of cocaine [less than one gram]," we reach a contrary conclusion where possession of more than one kilogram of cocaine is involved.

Cocaine is legally produced in significant quantities for medical use, but a relatively small proportion of this cocaine is stolen from legitimate sources in the United States and thereby might find its way into illicit drug traffic;[2] the remainder is smuggled. In Erwing v. United States, 323 F.2d 674, 678–679 (9 Cir. 1963), expert testimony revealed that it would be unlikely that a drug store would stock more than one ounce of cocaine hydrochloride or a hospital more than three or four ounces. Thefts from legitimate sources, then, would be of small amounts at any one time. To reach the conclusion that the thirty-five ounces found in defendants' possession was the aggregate of many small domestic thefts would entail some rather far-reaching speculations. Assuming that approximately two ounces

---

1. The disputed portion of 21 U.S.C. § 174 reads:

Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.

2. An Annual Report of the Bureau of Narcotics and Dangerous Drugs (1969) discloses that in the calendar year 1968 less than 5.5 kilograms of cocaine were stolen from legitimate U. S. sources and that in the 10 year span 1959–1968 inclusive, the average of yearly thefts was slightly over 4 kilograms.

of the thirty-five ounces of the drug the defendants exhibited for sale were stolen from domestic supplies at any one time, thieves would have needed to pilfer from eighteen or more hospitals or drug stores and, in order to amass the kilogram of cocaine contained in the two neat packages the defendants displayed, they, or unknowns with whom they had connections, would have been chargeable with nearly one-fifth of all the cocaine stolen from domestic sources in 1968.[3] We cannot accept such a chain of assumptions as plausible. We are convinced that the importation presumption *in this case fitted the facts perfectly* and the judge's charge to the jury was just as proper as it would have been if the defendants had possessed heroin.

The government evidence, if believed, established that the defendants knew that the kilo they possessed had been imported. Nevertheless, irrespective of that direct proof, the presumption of knowledge inferable from proof of possession is valid in this case.

In Leary v. United States, *supra*, a case involving a parallel statutory presumption as applied to a user of marijuana, the Court, after acknowledging that the presumption of knowledge could not be sustained "solely because of the assumed validity of the 'importation' presumption," stated:

> We conclude that in order to sustain the inference of knowledge we must find on the basis of the available materials that a majority of marijuana possessors are either cognizant of the apparently high rate of importation or *otherwise have become aware that their marijuana was grown abroad.* Id. at 46–47, 89 S.Ct. at 1553. (Emphasis supplied.)

While the *Leary* Court decided that "it would be no more than speculation" to conclude "that even as much as a majority of possessors 'knew' the source of their marijuana" and, therefore, struck down the "knowledge" presumption as applied to Dr. Leary, a user, we are dealing here with possessors of a different sort. This case does not deal with the majority of domestic cocaine possessors or with local residents suspected of being cocaine users and it does not deal with what such persons may "know" or "not know" of the sources of cocaine found in their possession. We are concerned here with Chilean citizens found in possession of a drug in an amount so large as to leave little doubt that it was smuggled, and we are confident that possessors of a kilogram of cocaine offering it for sale for $9,000 would be aware of the "high probability" that it was illegally imported unless they practiced a "studied ignorance to which [they were] not entitled." Persons who deal in large quantities of hard narcotics, as heroin and cocaine, are bound to discover, if they do not already know, that their product could not practically have derived from domestic sources. Cf. Turner v. United States, *supra* at 416, 417, and footnotes 29, 30, 34, 90 S.Ct. 642.

A second point, raised by appellant Ovalle, is that, as to him at least, he was never shown to be in possession, constructive or actual, of more than a tiny amount of the cocaine in question, and therefore *Turner* directly applies to him. We disagree. As previously pointed out, Ovalle was in the room when the sale of cocaine was consummated and he touched the substance by placing his fingers in one of the two bags containing the narcotics. It stretches credulity to suppose that Ovalle was only in possession of the amount of cocaine his fingers actually touched for he had physical "dominion and control" over all the contents of the container, at least during the moments he investigated the contents. As to the other bag of cocaine which lay on the bed a few feet away, it follows that Ovalle was equally as able as the others to pick up and examine its contents had the Narcotics Agent, acting as buyer,

3. See note 2 *supra*.

wished. This is not a case where due to defendant's disadvantaged "working relationship" with his confederates he was unable to help effectuate a transfer without coming into physical contact with the drug. See, e. g., United States v. Febre, 425 F.2d 107 (2 Cir. 1970); United States v. Jones, 308 F.2d 26 (2 Cir. 1962) (in banc).

■ A final point, raised by appellant Miranda, is that the trial court's instruction relating to defendants' "possession" of the cocaine in question failed to differentiate between *actual* or *physical* possession and *constructive* possession and Miranda was harmed thereby. This is an unusual point to be argued by a defendant; it is the prosecution that insists that the jury be informed as to the meaning of constructive possession, particularly in a case where physical possession is not proved. In the case at bar the evidence showed that Miranda and Ovalle physically possessed at one point at least half (one bag) of the total amount of cocaine involved in the sale, and because of their close association with the planning and mechanics of the narcotics sale and transfer and their ability actually to get their hands on the cocaine, a finding of constructive possession of the other half, which lay within easy reach on a bed in the hotel room, was warranted. There is absolutely no way that Miranda, or indeed any of the defendants, could have been prejudiced by the court's failure to distinguish between the two types of possession. In short, had the judge told the jury that it could find that a defendant was in possession of the cocaine within the meaning of the statute "even though [a defendant did] did not have physical custody, so long as [a defendant had] dominion and control over the narcotics," United States v. Baratta, 397 F.2d 215, 224 (2 Cir.), cert. denied, 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968), we cannot see, nor has appellant Miranda indicated, even a remote possibility that the jury's verdict may have been different. A more complete charge would have made it *easier* for the jury

to conclude that the defendants possessed the narcotics in question.

Affirmed.

IRVING R. KAUFMAN, Circuit Judge (dissenting):

While I can hardly fault my brother WATERMAN'S conclusion that defendants' cocaine must have been imported, I cannot persuade myself to follow in the majority's second crucial step and hold that Gonzalez, Miranda, and Ovalle must therefore have known that it was imported. Nor do I relish the prospect of facing a subsequent case, where the questions presented here must again be weighed in grams and ounces.

In Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), the Supreme Court instructed us that the presumption of guilt permitted by 21 U.S.C. § 174 cannot be applied to defendants charged with possessing a small amount of cocaine. My brothers, however, attempt to bypass that holding by placing their reliance entirely upon that portion of *Turner* which upheld the § 174 presumption with respect to heroin—not cocaine.

I believe that this analogy, which admittedly offers its surface attractions, cannot withstand analysis. The *Turner* Court found that the defendant must have been knowledgeable about every facet of the heroin business, but not until Justice White had shown by painstaking elaboration that the Court was impelled to the conclusion that virtually *all* heroin in this country is imported. "To possess heroin *is* to possess imported heroin." 396 U.S. at 416, 90 S.Ct. at 652 (original emphasis). Even supported by so rare an absolute, it will be noted, the Court felt nonetheless constrained to concede that the question of knowledge was not then decided *a fortiori*. Rather, the Court reasoned, that while an "ordinary jury" may not be aware of the dearth of heroin produced here, common sense would not permit *dealers* in heroin to disclaim knowing the source of their livelihood.

In sharp contrast to the state of the heroin market, "much more cocaine is lawfully produced in this country than is smuggled into this country." 396 U.S. at 418, 90 S.Ct. at 653.[1] In this case, the majority has determined that, despite this key statistic, it is peradventure clear that defendants' cocaine was imported. My quarrel goes not to my brothers' reasoning in this respect, but to the nexus between the court's well turned syllogism and the defendants' states of mind. The majority's logic proceeds by three steps: relatively little of the cocaine produced here is stolen; each theft usually involves quite a small amount of cocaine; therefore, it says, it is far more likely that defendants' substantial stash of the drug[2] was imported all at one time than that it represented the accumulated fruits of petty thievery.

Apart from a bare expression of self-confidence in its conclusion, the majority's authority for sustaining the presumption of knowledge in this case comprises this analysis, plus the observation that defendants are Chilean citizens. I am reluctant after *Turner* to permit a "presumption" of guilt in this cocaine case, absent some proof of defendants' knowledge. Mere attribution to them based on the refined, albeit acute, reasoning of the majority cannot overcome the Supreme Court's clear holding. In the absence of any evidence whatever, one simply cannot say in light of *Turner*, except by fiat, that dealers in cocaine —whether they are citizens of Chile, Canada or Timbuktu—do or do not know its source. I am as ready as not to surmise, absent some facts, that although

many sellers know that much cocaine is produced in this country, they may not have the slightest idea what part of this is pilfered and in what size lots.

Moreover, I find the majority's opinion in this respect difficult to reconcile with the Supreme Court's implicit mandate last year in Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), that such presumptions as that embodied in § 174 are tolerable only upon careful sifting of appropriate statistical information:

> In order * * * to determine the constitutionality of the 'knowledge' inference, one must have direct or circumstantial data regarding the beliefs of marihuana users generally about the source of the drug they consume. Such information plainly is not within specialized judicial competence or completely commonplace; * * *. Since the determination of the presumption's constitutionality is 'highly empirical,' * * * it follows that we must canvass the available, pertinent data.

395 U.S. at 37, 89 S.Ct. at 1549.[3] Thus, wholly apart from *Turner*, I cannot understand how the majority can make its leap over the hurdle of *Leary*. We were clearly instructed there that a presumed fact must "with substantial assurance" follow "more likely than not * * * from the proved fact on which it is made to depend." 395 U.S., at 36, 89 S. Ct. at 548. Moreover, the majority's resourcefulness is even more remarkable in view of the admonition in *Turner* that the government was required to prove *each* of the three elements of the

---

1. The absolute quantity of cocaine produced in this country is significant as well: some 609 kilograms were manufactured here in 1966. 396 U.S. at 418 n. 36. Defendants in this case were found with approximately one kilogram (see note 2, *infra*).

2. 1,028 grams *as* compared with the 14.68 grams of a mixture of 5% cocaine and sugar in *Turner*.

3. In *Leary*, Mr. Justice Harlan was able to dismiss with a brief footnote the

phalanx of Circuit Court precedent contrary to the Court's holding that knowledge of illegal importation may not be inferred from mere possession of marihuana. The Court found "no indication" in the contrary cases that "the court * * * took into account even a fraction of the evidence which we have considered: in one instance, the lack of evidence was expressly stated to be the ground of decision." (citing this court's opinion in United States v. Gibson, 310 F.2d 79 (2d Cir. 1962)).

offense charged against these defendants (possession, illegal importation, and knowledge) "to the satisfaction of the jury beyond a reasonable doubt." 396 U.S. at 405, 90 S.Ct. at 646.[4] *See generally*, Ashford & Risinger, Presumptions, Assumptions, and Due Process in Criminal Cases: A Theoretical Overview, 79 Yale L.J. 165 (1969).

At the very least, I believe that the jury and not this court, should have determined whether, without the use of the presumption, the astute comments of the majority concerning quantity, thefts of cocaine, and nationality, established knowledge of importation beyond a reasonable doubt. This is not my mandate, but *Turner's* and *Leary's*.

Since it is impossible to tell whether or not the jury relied on the statutory presumption, see United States v. Romano, 382 U.S. 136, 138–139, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965), the instruction which included the presumption cannot be regarded as harmless error.

### On Rehearing In Banc

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.

WATERMAN, Circuit Judge, with whom Chief Judge LUMBARD, and Judges MOORE, FRIENDLY, HAYS and ANDERSON join:

Each of the appellants, alleging an apparent conflict between the panel decision in this case affirming each of the convictions below,[1] and an earlier panel decision in United States v. Vasquez, 429 F. 2d 615 (2 Cir. 1970), petitioned to have the panel opinion here reconsidered by the full court sitting *in banc*. We granted the petition, and although the statutory provision [2] which gives rise to the has been repealed as of May 1, 1971,[3] we find that *in banc* consideration is desirable in view of our belief that a significant number of cases have been or are yet to be prosecuted in the district courts under the former statutory provisions. The *in banc* court accepts as the factual background of the case the summary stated in the panel opinion. We quote:

The three appellants, together with Emilio Massu, were charged in a two count indictment with, first count, having violated and, second count, having conspired to violate the federal narcotics laws, 21 U.S.C. §§ 173, 174. After a jury trial all four were convicted on both counts. Each of the three appellants took the stand and testified. Massu remained silent. Massu, Gonzalez and Miranda received sentences of five years' imprisonment on each count, the sentences to be

4. See also In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970): "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

1. Decided Sept. 16, 1970. Reported at 442 F.2d 698 of 1969 Term.

2. 21 U.S.C. § 174 provides for the punishment of those who illegally import narcotic drugs or who, with knowledge of the illegal importation, facilitate the "transportation, concealment, or sale" of an illegally imported narcotic drug. The second paragraph of § 174 contains the provision challenged by appellants:

> Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.

3. Pub.L. 91–513, Title III, § 1101(a) (2), Oct. 27, 1970, 84 Stat. 1291. The repeal is part of the Comprehensive Drug Abuse Prevention and Control Act. It is effective on May 1, 1971. Under the new prohibitions Congress, eschewing the presumptions, has prohibited directly the possession of drugs (§ 404(a) of the Act) or the manufacture, distribution, or dispensation of drugs, or the possession of drugs with intent to manufacture, distribute, or dispense (§ 401(a) of the Act).

served concurrently, and Ovalle was sentenced to concurrent six year terms. *Massu declined to file a notice of appeal.* All four are serving their sentences.

In large measure the resolution of the defendants' guilt or innocence depended upon whether the jurors believed or disbelieved the government witnesses, for each of the appellants denied any connection with or knowledge of the illegal narcotics transaction in which the government witnesses testified they had been engaged.

The government evidence, however, quite conclusively proved that appellants were criminally involved. The government evidence brought out the facts now recited.

On December 16, 1968 Ovalle approached one Carmelo Viera, an informant in the employ of the Federal Bureau of Narcotics, to discuss the sale of a kilogram of cocaine. Viera was interested in buying it. Ovalle's price was $9,000. Viera, having shown interest in making a purchase, was next introduced to Massu, who assured Viera that the cocaine offered for sale was "a hundred percent pure," having been, by Massu himself, personally brought into the United States from Chile. Massu also stated that he imported cocaine about once a month "as a seaman" and, if Viera wished, he could bring him more in the future. Later in the day, after meeting with federal narcotics agents, informant Viera again met with Ovalle and told him a customer had been found willing to buy the cocaine kilo.

On December 18, in the morning, Viera met Ovalle and told him that the buyer would be ready at three, and, at three, Viera introduced Ovalle to the buyer, John Lepore, a Bureau of Narcotics Agent, who promptly showed Ovalle $9,000 in cash. Ovalle then told Lepore he would return with the drugs later in the day and left, Viera accompanying him. Ovalle and Viera then met with Massu, Gonzalez and Miranda and it was arranged by them to have Lepore consummate the purchase at a hotel room where the imported cocaine was kept. Massu and Gonzalez were left near the hotel, and Viera, Miranda and Ovalle proceeded to where Lepore was waiting. On the way Miranda told Viera in Ovalle's presence that she could get an additional five kilograms of cocaine by the end of January. Viera, Miranda and Ovalle directed Lepore to the hotel. Once the defendants, informant Viera, and agent Lepore had gathered in the hotel room, Gonzalez, at Massu's direction, removed a shopping bag from a closet and placed it on one of the beds. Massu then removed two cellophane bags of equal size, which upon later inspection were discovered to contain approximately 1,028 grams (over 2⅕ pounds) of cocaine, and handed one of the bags to the agent. Agent Lepore indicated he could not see through the wrapping, so Massu split the seal with a razor to facilitate a closer examination of the merchandise. While Lepore was inspecting the bag's contents Massu, Ovalle and Miranda fingered the crystalline substance and assured Lepore that the cocaine was pure and of good quality. Shortly thereafter the defendants were arrested. A search followed and a black leather suitcase with a false bottom was discovered. In it were an Argentinian Airlines ticket receipt reflecting a flight from South America to New York by Miranda, Miranda's Chilean Passport showing that she arrived in New York on November 27, 1968, and a Braniff Airways ticket receipt reflecting a flight from South America to New York by Gonzalez. These items were admitted into evidence. The four defendants are Chilean nationals. Both women testified to having traveled to New York in November, Miranda on the 27th, her first trip, and Gonzalez, who had previously been to New York, on the 24th to join Emilio Massu, her common law husband of 27 years.

Motions for a directed verdict of acquittal were made at the close of the Government's evidence and at the close of all the evidence. These motions were denied. A post-verdict motion to set aside the jury's verdict as having been contrary to the weight of the evidence and against the applicable law and for a new trial were also made and denied.

Appellants challenge, on Fifth Amendment grounds, the inferences of illegal importation and knowledge of illegal importation which are allowed by the statute once "unexplained" possession of cocaine is established. Although sufficient evidence was introduced at trial to warrant the jury to find beyond a reasonable doubt that the cocaine found in defendants' possession was illegally imported and that the defendants knew it, the trial court instructed the jury that they could infer the "importation" and "knowledge" elements of the crime without relying on any evidence to support such inferences other than the evidence that the defendants possessed the cocaine.

The trial of these appellants was held and was concluded prior to the decision in Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), and the instructions given the jury were proper ones under the then existing law. In *Turner*, however, the Court, although taking note of the fact that from 1963 through 1968, the amount of cocaine stolen from legal channels annually, an illegal possessor's only source of domestic cocaine, ranged from 2.8 to 6.2 kilograms, ruled that possession of relatively small amounts of cocaine (in Turner's case less than one gram) did not meet the constitutional test of the statutory presumption, saying:

> Applying the more-likely-than-not standard employed in [Leary v. Unit-

ed States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969)], we cannot be sufficiently sure either that the cocaine that Turner possessed came from abroad or that Turner must have known that it did. *Id.* at 419, 90 S.Ct. at 654.

However, in light of the facts above cited, the *Turner* Court went on to state in a footnote, fn. 39, that "sellers found with much larger amounts of cocaine than Turner had, amounts which, it is claimed, are too large to have been removed from legal channels and which must therefore have been smuggled," presented an issue better postponed "to another day, hopefully until after the facts are presented in an adversary context in the district courts." *Id.* at 419, n. 39, 90 S.Ct. at 654.

■ Both the present appeal and the appeal in *Vasquez* were presented to panels subsequent to the handing down of the opinion in *Turner*. The panel in *Vasquez* concluded that the language in *Turner* footnote 39 required an adversary hearing in the district court to resolve the issue of the rationality of the presumption. 429 F.2d at 618. Although we agree that such an adversary hearing might well elicit valuable statistical information, we do not interpret the Supreme Court's language to prevent appellate consideration of the issue upon facts adversarily presented to juries prior to *Turner* or to imply anything more than the "hope" that, should the issue of the presumption's rationality be raised on appeal, a full record would be available on the issue. Indeed, *Turner* itself indicates that, where adequate information is available for the taking of judicial notice, an appellate court should use such information.[4]

Section 174 contains two presumptions. The first, the presumption of importation, permits a jury to infer the fact of

---

4. The Court of Appeals opinion in *Turner*, 404 F.2d 782 (3 Cir. 1968), makes clear that the prosecution offered no evidence as to Turner's knowledge or as to the source of the drugs. Thus, the massive statistics cited in the Supreme Court's opinion were undoubtedly brought into the case through appellate briefs or by judicial notice.

illegal importation of a narcotic drug from a defendant's possession of the drug; the second, the presumption of knowledge, permits an inference that the defendant who possesses the drug knew that the drug was illegally imported.[5] Because the two presumptions require different treatment, we discuss them separately.

## I.

In *Turner* the Government conceded and the Court found that "thefts [of cocaine] from legal sources, though totaling considerably less than the total smuggled, are still sufficiently large to make the § 174 presumption invalid as applied to Turner's possession of cocaine [less than one gram]." *Id.* at 418–419, 90 S. Ct. at 653. However, by using the same statistics cited in *Turner*, and by using updated statistics as well, we reach the conclusion that the presumption of illegal importation is rationally valid where the possessor has possession of more than one kilogram of cocaine.

Cocaine is domestically legally produced in sufficient quantities for medical use, but a relatively small proportion of this domestically produced cocaine is stolen from legitimate sources in the United States so as theoretically to find its way into the domestic illegal drug traffic.[6] The remainder of the cocaine trafficked in this country is smuggled.[7] In Erwing v. United States, 323 F.2d 674, 678–679 (9 Cir. 1963), expert testimony revealed that it would be unlikely that a drug store would stock more than one ounce of cocaine hydrochloride or a hospital more than three or four ounces. Thefts from legitimate sources, then, would be of small amounts at any one time.[8] To reach the conclusion that the thirty-five ounces found in the defendants' possession was the aggregate of many small domestic thefts would entail some rather far-reaching speculations. Assuming that approximately two ounces of the thirty-five ounces of the drug the defendants exhibited for sale were stolen from domestic sup-

---

5. As in Leary v. United States, 395 U.S. 6, 46 n. 93, 89 S.Ct. 1532, 23 L.Ed.2d 57, and in *Turner*, 396 U.S. at 416, n. 29, 90 S.Ct. 642, we adopt the definition of "knowledge" employed in The American Law Institute Model Penal Code § 2.02 (7) (proposed official draft, 1962):

 When knowledge of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist.

6. An Annual Report of the Bureau of Narcotics and Dangerous Drugs (1969) discloses that in the calendar year 1968 less than 5.5 kilograms of cocaine were stolen from legitimate U.S. sources and that in the ten-year span 1959–1968 inclusive, the average of yearly thefts was slightly over 4 kilograms. The Bureau's statistics also disclose that in 1969 slightly less than 6.5 kilograms of cocaine were stolen from legitimate channels.

7. Annual seizures of cocaine at ports and borders for the years 1963 through 1967 ranged from 1.44 kilograms to 17.71 kilograms; for those years it was estimated that only 10% of the cocaine that was attempted to be smuggled into the United States was discovered and seized at ports

and borders. *Turner, supra,* at 418 n. 36, 90 S.Ct. 642. We judicially notice publicly available information obtainable from the Department of Narcotics and Dangerous Drugs that the Bureau of Customs reported seizures totaling 169.-193 kilograms of cocaine during 1970. The border seizures of cocaine in 1970 were thus 24 times as large as the thefts of domestic cocaine in 1969. See fn. 8 *infra.* If the 10% ratio still holds, total importation would be more than 300 times 1968 thefts of domestically produced cocaine. Even if the ratio has substantially increased, the disproportion is still tremendous.

8. More recent statistics reenforce this conclusion. The Department of Narcotics and Dangerous Drugs reports that cocaine thefts amounted in 1967 to 5.033 kilograms in 674 thefts, in 1968 to 5.470 kilograms in 738 thefts, and in 1969 to 6.472 kilograms in 730 thefts. These figures are a matter of public record, and we accordingly take judicial notice of them. The figures indicate, for example, that in 1969 the average domestic theft of legally possessed cocaine was approximately 9 grams, or less than one-third of an ounce.

plies at any one time, thieves would have needed to pilfer from eighteen or more hospitals or drug stores and, in order to amass the kilogram of cocaine contained in the two neat packages the defendants displayed, they, or unknowns with whom they had connections, would have been chargeable with nearly one-fifth of all the cocaine stolen from domestic sources in 1968.[9] We cannot accept such a chain of assumptions as being even remotely plausible. We are convinced that the presumption of illegal importation in this case rationally fits the facts perfectly.

■■ By our conclusion that the presumption of illegal importation under § .174 is valid where the possession of large quantities of cocaine is involved,[10] we do not intend to limit our holding to quantities exceeding one kilogram. Obviously the reasoning behind our conclusion is exactly as applicable to large quantities of cocaine, although less than a kilogram, as the *Turner* reasoning is to small quantities of cocaine, although more than a gram. In cases already tried and not yet decided on appeal, we must, in line with the rationale of this opinion, decide each case on an individual basis. In doing so we must consider both the quantity of cocaine involved and the possibility of harmless error.[11] With reference to cases yet to be tried, the district courts would be well advised to refrain from charging the statutory presumption as such except when the quantity is decidedly on the high side and to refrain from any charge of the presump-

tion when the quantity is of the order of 10 grams or less. In cases between these extremes, the judge should frame instructions relating the facts as to importation of cocaine and as to thefts from legitimate sources,[12] thereby permitting the jury to decide whether the quantity of cocaine is sufficient to justify a finding of illegal importation beyond a reasonable doubt.

## II.

In *Turner* the validity of the presumption of knowledge of illegal transportation of cocaine necessarily fell when the presumption of illegal importation was held to have lacked a rational relationship to the amount of diluted cocaine possessed. But, with respect to one's possession of a specified narcotic drug, the validity of the presumption of its illegal importation does not necessarily imply the validity of the presumption that the possessor had knowledge thereof. In Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), a case involving parallel statutory presumptions as applied to a user of marihuana, the Court, after acknowledging that the presumption of knowledge could not be sustained "solely because of the assumed validity of the 'importation' presumption," [13] stated:

> We conclude that in order to sustain the inference of knowledge we must find on the basis of the available materials that a majority of marihuana possessors are either cognizant of the apparently high rate of impor-

9. See *supra* notes 6 and 8.

10. Of course the jury should be instructed that the presumption is limited to large quantities of cocaine. However, we find that the failure to do so in the present case was harmless error.

11. See *supra* note 10, and *infra* note 14.

12. The size of thefts from legitimate sources is, of course, a most crucial factor. While a district court may take judicial notice of the statistics we have used in this decision, we do not preclude, but indeed

encourage, the submission of evidence by trial counsel on this point.

13. See also United States v. Avey, 428 F.2d 1159 (9 Cir.), cert. denied, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed. 2d 139 (1970), and United States v. Sherman, 430 F.2d 1402, 1406 (9 Cir. 1970), cert. denied, 401 U.S. 1015, 91 S.Ct. 1249, 28 L.Ed.2d 552 (1971), where the presumption of illegal importation of marihuana was held to be valid despite the Court's holding in *Leary* that the presumption of knowledge is invalid.

tation or *otherwise have become aware that their marihuana was grown abroad. Id.* at 46–47, 89 S.Ct. at 1553. (Emphasis supplied.)

The *Leary* Court decided that "it would be no more than speculation" to conclude "that even as much as a majority of possessors 'knew' the source of their marihuana" and, therefore, the Court struck down the presumption of knowledge as applied to Dr. Leary. *Id.* at 53, 89 S.Ct. at 1557. The *Turner* Court, in addressing the presumption of knowledge as applied to heroin, reached an opposite conclusion; there the presumption was applied to Turner who possessed 275 glassine bags of heroin and who the Court concluded was a distributor of that drug. 396 U.S. at 416–417 and n. 30, 90 S.Ct. 642.

In the original panel decision in this case the panel noted that there was substantial evidence that the appellants knew that the cocaine they were selling was illegally imported,[14] but that "[n]evertheless, irrespective of that direct proof, the presumption of knowledge inferable from proof of possession is valid in this case." [15] This conclusion was founded on the evidence that appellants were dealers in, and had proposed to sell, large quantities of cocaine and on the proposition that "[p]ersons who deal in large quantities of hard narcotics as heroin and cocaine are bound to discover, if they do not already know, that their product could not practicably have de-

rived from domestic sources." [16] When the basic fact of one's possession of large quantities of cocaine is shown, an inference may be rationally drawn that the possessor is a dealer in cocaine and thus in all likelihood knew of the cocaine's illegal source.

 Inasmuch as the amount of cocaine stolen from domestically produced sources is but a significantly minor quantity in comparison to the amount of cocaine illegally imported, and inasmuch as the average theft is only nine grams (see footnotes 7 and 8, *supra*), the creation of a rebuttable inference that, in the absence of explanation, the possessor of a large quantity of cocaine knew it was imported is sufficiently rational to withstand all constitutional attacks. The discussion in *Turner* with respect to heroin, 396 U.S. at 416–417, 90 S.Ct. 642, appears to us to be almost directly in point.

### III.

Two other contentions, raised by appellants Ovalle and Miranda respectively on the initial appeal, are not pressed on this rehearing, and we fully accept the panel's prior disposition of these points.

Affirmed.

IRVING R. KAUFMAN, Circuit Judge (dissenting) :

For the reasons stated in my dissent from the panel opinion in this case, which the majority of the *in banc* court today affirms, I continue to believe that

14. Indeed, the evidence tended to show that appellants themselves were the actual importers. For example, the informant Viera testified that Massu told him in Ovalle's presence:

"Well, this is a hundred per cent pure and I bring it from Chile about once a month as a seaman and then if you want some more I could bring you some more later on."

Transcript (T.) at 30. Elba Miranda told Viera the next day (December 18), "Well, I can get you five kilos by the end of January." T. at 36. Airline tickets to New York from South America indicating the recent arrival of Miranda

and Gonzalez were introduced into evidence as well as Miranda's Chilean passport. T. at 102–105, 128–131. This evidence was found in the hotel room in a black leather suitcase with a false bottom which appeared to have been used in transporting the cocaine. There was also substantial evidence to indicate that all the defendants were involved in the joint venture and that the knowledge of each could be imputed to the others.

15. *Supra* at 702.

16. Supra at 702, Cf. *Turner, supra,* at 416–417, 90 S.Ct. at 652–653.

the presumption of knowledge in 21 U.S. C. § 174 cannot be upheld on this record. 442 F.2d 703. I find no relevant evidence properly before us upon which to base any conclusion about the likelihood that an average possessor of a "large" quantity of cocaine—whatever that might be—will know that the narcotic was probably imported.

FEINBERG, Circuit Judge, with whom J. JOSEPH SMITH, Circuit Judge, joins (dissenting):

Since I believe that the proper course to follow here is to remand this case to the district court for an adversary hearing on the validity of the presumptions in 21 U.S.C. § 174, I respectfully dissent.

In Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), the Supreme Court held that possession of less than one gram of cocaine was insufficient to warrant the presumptions of section 174 "either that the cocaine that Turner possessed came from abroad or that Turner must have known that it did." *Id.* at 419, 90 S.Ct. at 654. Accordingly, it reversed Turner's conviction on a cocaine count. However, it postponed consideration of whether the same section 174 presumptions might be valid as applied to a large amount of cocaine, "hopefully until after the facts [had] been presented in an adversary context in the district courts." *Id.* at 419 n. 39, 90 S.Ct. at 654. Some six months later, the issue came before this court in a case tried before the *Turner* decision and involving 831 grams of cocaine, United States v. Vasquez, 429 F.2d 615 (2d Cir. 1970). At that time, we followed the Court's suggestion and sent the case back to the district court for an adversary hearing on a full record on the rationality of the presumptions.

Despite the suggestion of the Supreme Court and the prior action of this court, the majority in this case now proceeds to decide these extremely important issues upon a record made before the decision in *Turner* and therefore devoid of the facts necessary to an informed determination. Instead the majority relies upon "evidence" which has not truly been subjected to the adversarial process. I emphatically dissent from this course. I continue to believe that the Court's "hope" should be our command, unless there is some good reason for disregarding it. I see none, and the majority opinion advances none. To the contrary, there are good reasons for following the Court's suggestion. As to the cocaine transaction in 1968, the year involved here, the majority refers to no more relevant information about importation or theft from domestic sources than the court had in *Turner*, when it refused to decide the issue presented here. Nor is the doubt expressed in *Turner* relieved by reference by the majority in this case to statistics of 1969 and 1970. Moreover, on this record, the presumption of defendants' knowledge of illegal importation of the cocaine is particularly vulnerable, as Judge Kaufman's dissent to the original panel opinion pointed out.[1] Finally, the defendants should, in any event, be given the opportunity to contest at the trial level the "judicially noticed" facts relied upon here and to elicit what the majority concedes "might well [be] valuable statistical information." P. 707 *supra*.

It may be that upon a proper record the majority would be correct in concluding that the presumptions are valid, at least as applied to one kilogram or other "large quantities" of cocaine. But these issues should be decided after an adversary hearing in the district court on the validity of the presumptions. I would remand for such a hearing.

1. *Supra* 703–705 (1969 Term, Sept. 16, 1970).